FIFTH DIVISION

No. 1-09-0149

| | | |
|---|---|---|
| BERNSTEIN AND GRAZIAN, P.C., and THE ESTATE OF ISADORE M. BERNSTEIN, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants and Cross-Appellees, | ) ) | |
| v. | ) | No. 06 CH 08431 |
| | ) | |
| GRAZIAN AND VOLPE, P.C., and JOHN LEONARD GRAZIAN, | ) ) ) | |
| | ) | |
| Defendants-Appellees and Cross-Appellants | ) ) | |
| (Richard S. Volpe, | ) ) | The Honorable William Maki, |
| Defendant). | ) | Judge Presiding. |

_____JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiffs-appellants and cross-appellees Bernstein & Grazian, P.C. (B&G), and the Estate

of Isadore M. Bernstein, deceased (Bernstein),[1] brought suit against B&G's former law partners

defendants-appellees and cross-appellants Grazian & Volpe, P.C. (G&V), John Leonard Grazian

(Grazian), and Richard S. Volpe (Volpe)[2] for breach of contract and fiduciary duty, seeking an

accounting, an injunction and other relief. G&V, Grazian and Volpe, meanwhile, brought a

_____

[1]We note for the record that Isadore M. Bernstein was the party who originally filed the

instant appeal. However, during its pendency, he passed away. On April 27, 2010, we allowed a

motion spreading his death of record and substituting his estate in his stead.

[2]Richard S. Volpe is not a party to this appeal.

counterclaim against B&G, also for breach of fiduciary duty. Following a bench trial, the trial court issued a decision finding that no party violated any fiduciary duty and that *quantum meruit* was the appropriate legal doctrine to apply to the instant facts. It ultimately awarded Bernstein 10% of the attorney fees recoverable in B&G cases that G&V had assumed following the dissolution of that law partnership.

Bernstein appeals, contending that the trial court erred as a matter of law in awarding him fees under *quantum meruit.* He argues that he is entitled to 50% of the attorney fees at issue pursuant to a certain agreement in operation at B&G or, alternatively, that he is entitled to 70% of these fees pursuant to Illinois corporate law. He asks that we vacate the trial court's order and award him a greater percentage of the attorney fees. For his part, Grazian cross-appeals, contending that the trial court erred in finding that Bernstein did not violate any fiduciary duty, and that it erred in awarding Bernstein the 10% of attorney fees under *quantum meruit*, arguing that there was no evidence to support this.

For the following reasons, we dismiss Bernstein's direct appeal, and we affirm in part and vacate in part the trial court's judgment regarding Grazian's cross-appeal.

BACKGROUND

Bernstein and Grazian first met in the early 1990s; Grazian eventually began working for Bernstein as an independent contractor in Bernstein's law practice. In 1998, Bernstein asked Grazian to merge practices and they formed the law partnership of B&G, which focused on personal injury and workers' compensation cases. Bernstein was the president of B&G and owned 70% of its stock; the firm operated from his offices and he contributed the case files and

money to start the business. Grazian was vice president, secretary and treasurer and owned the remainder of the stock; he did not share in any of the expenses of B&G but, instead, worked as a salaried employee handling B&G's personal injury cases. Later, Volpe came to work at B&G; he was not a founding partner of the firm and did not share in the expenses, but only worked on B&G's workers' compensation matters. B&G also dealt with medical malpractice cases in that any that came into the firm were referred out by Bernstein; neither Grazian nor Volpe worked on these cases. The compensation agreement in operation at this time reflected Grazian's status as a salaried employee. It described that he was to work 50 hours a week, would be paid an annual salary of $100,000, and that, if his employment were terminated, B&G would purchase his stock and pay him a set severance.

By January 2003, Bernstein, Grazian and Volpe decided to change B&G's method of compensation. They entered into a new compensation agreement (Agreement), effective February 2003. Significantly, the handwritten Agreement, as signed by Bernstein, Grazian and Volpe, provided that the three attorneys were to "split" all office expenses, or general overhead, of B&G "equally." In addition, the Agreement stated, in pertinent part, that:

-Bernstein and Volpe "will split all litigation expenses on the workers['] compensation files, only, equally";

-Bernstein and Grazian "will split all litigation expenses on the personal injury cases files [*sic*], only, equally";

-Bernstein and Volpe "will split all fees fees [*sic*] received on workers['] compensation cases *** on a 50/50 basis"; and

3

-Bernstein and Grazian "will split all fees received on personal injury case files \*\*\* on a 50/50 basis". (Emphasis in original.)

Essentially, and the parties agree, the crux of the Agreement resulted in Volpe paying 50% of the expenses of B&G's workers' compensation cases and receiving 50% of the attorney fees generated therefrom; Grazian paying 50% of the expenses of B&G's personal injury cases and receiving 50% of the attorney fees generated therefrom; and Bernstein paying the remaining 50% of the expenses on both B&G's workers' compensation and personal injury cases and receiving the remaining 50% of the attorney fees generated therefrom.

By 2005,[3] Grazian and Volpe decided to leave B&G and form their own law firm, known as G&V. Accordingly, Bernstein and Grazian agreed to terminate and dissolve B&G as of December 31, 2005, and that G&V would take over B&G's open cases. However, there are differing accounts regarding the division of recoverable attorney fees on the pending B&G cases. Bernstein testified at trial that he told Grazian that he (Grazian) could take and transfer B&G's open personal injury and workers' compensation cases to G&V, as long as Grazian and Volpe gave him 50% of the attorney fees they recovered. Bernstein further testified that Grazian accepted his offer. In direct contrast, Grazian testified at trial that he did not agree to this, but

___

[3]There is a multitude of facts in the record regarding the dissolution of B&G, which we have chosen not to present here. This is because they are not relevant to the direct appeal, which we will address and resolve first, but, rather, pertain mainly to the issues raised by Grazian on cross-appeal. As such, we will present these facts, as they are relevant, when we address and resolve the cross-appeal later in our decision.

offered Bernstein only one-third of the fees they recovered, and that Bernstein accepted his offer.

As Grazian and Volpe's departure from B&G and B&G's dissolution approached, steps were taken to transfer B&G's open cases to G&V. A letter was signed by each of the parties-- Bernstein, Grazian and Volpe--and was sent to each of B&G's clients explaining the termination of B&G, its withdrawal from their open cases, and the creation of G&V. An accompanying cover letter sought the written consent of each client for the transfer of its files from B&G to G&V. Every B&G client agreed to the transfer. In addition, both Grazian and Bernstein signed withdrawal and substitution-of-attorney forms in each and every B&G case. Grazian took these forms and filed them in court. The record again demonstrates disagreement on these points. Bernstein testified at trial that he was shocked that Grazian filed these forms in court, and he did not intend to withdraw or allow Grazian to become the substitute attorney on the open B&G cases until there was a formal separation and exit agreement drafted among the parties guaranteeing him (Bernstein) 50% of the recoverable attorney fees. In contrast, Grazian testified that Bernstein never mentioned any sort of exit agreement but, rather, knew that he (Grazian) was going to file these forms in court and that G&V would be giving Bernstein one-third of the attorney fees on the open B&G cases, not 50%.

Bernstein and B&G filed a complaint for injunctive and other relief against Grazian, Volpe and G&V, alleging breach of contract and breach of fiduciary duty and demanding an accounting. In response, Grazian, Volpe and G&V filed a counterclaim against Bernstein, asserting breach of fiduciary duty. The causes proceeded to a bench trial. At its conclusion, the trial court found that all the witnesses, including both Bernstein and Grazian, had been "competent and credible."

Regarding the causes' merits, the court first declared Bernstein's demand for the accounting moot and dismissed that count. Next, regarding fiduciary duty as raised by both sides in the case, the court held that while Bernstein owed Grazian a fiduciary duty and while Grazian likewise owed Bernstein a fiduciary duty, by virtue of their relationship via B&G, neither party breached his duty to the other; therefore, the court dismissed Bernstein's count for breach of fiduciary duty and Grazian's counterclaim regarding the same.

The court then discussed the breach of contract claim. Regarding this, the court declared that the focus was not to be on the Agreement between the parties (*i.e.*, the new compensation agreement they had formed in February 2003) but, rather, on the "contract" winding up B&G's business, which the parties had agreed would ceased on December 31, 2005. However, the court noted that it was uncontested that this contract did not address the division of B&G's proceeds. Because of this, the court decided that *quantum meruit* was the "persuasive argument in this case." In determining the proper amount to award Bernstein pursuant to this legal doctrine, the court found that, while Bernstein had made some contribution to B&G, his contribution to its cases clearly "diminished" and even "deteriorated" over the years until its dissolution in 2005, placing "a burden" on Grazian and Volpe and B&G's practice in general. The court also noted that it was very difficult to decipher a *quantum meruit* award from the evidence presented because it was dealing with a high-volume law practice. Ultimately, concluding that Bernstein "did contribute something," it awarded him 10% of the attorney fees of the open B&G cases G&V had assumed.

Following the trial court's decision, Bernstein filed his notice of appeal and Grazian filed

6

No. 1-09-0149

his notice of cross-appeal.

ANALYSIS

I.  Bernstein's Direct Appeal

We begin by addressing Bernstein's direct appeal.  As noted earlier, he presents alternative contentions for our review.  Principally, he argues that the trial court erred as a matter of law in employing *quantum meruit* and awarding him attorney fees pursuant to this legal doctrine.  First, citing Ellerby v. Spiezer, 138 Ill. App. 3d 77 (1985), he claims that fees from cases pending upon dissolution of a law partnership are to be distributed according to the Uniform Partnership Act (805 ILCS 205/1 *et seq.* (West 2000)), not by *quantum merit.*  Accordingly, he insists that the February 2003 Agreement he had with Grazian governs here and, pursuant to it, he is entitled to 50% of the recoverable attorney fees from the transferred B&G cases.  Then, he alternatively cites the Illinois Business Organizations Act (805 ILCS 5/1.01 *et seq.* (West 2000)), and claims that the attorney fees from the "unfinished business" of B&G should be distributed according to its stock holdings.  Accordingly, he insists that, as he owned 70% of B&G's stock, he is entitled to 70% of the attorney fees.  Meanwhile, Grazian argues that Bernstein has forfeited these issues for review under the waiver doctrine for several reasons and, in addressing the merits of Bernstein's appeal, insists that Ellerby does not apply and that they trial court properly employed *quantum meruit* under Thompson v. Hiter, 356 Ill. App. 3d 574 (2005), as this was Bernstein's only possible avenue for any recovery under the circumstances.

As a threshold matter, we must discuss our jurisdictional ability to review Bernstein's

7

No. 1-09-0149

direct appeal.[4] See People v. Smith, 228 Ill. 2d 95, 106 (2008) (quoting R.W. Dunteman Co. v. C/G Enterprises, Inc., 181 Ill. 2d 153, 159 (1998), and stating, " '[a] reviewing court must be certain of its jurisdiction prior to proceeding in a cause of action,' " as this is "one of the *** most important tasks" it is to perform before beginning review of a case).

The record reflects that the trial court entered its final order in the cause finding no breach of fiduciary duty and awarding Bernstein 10% under *quantum meruit* on December 17, 2008. Bernstein filed his notice of appeal on January 16, 2009, and Grazian filed his notice of cross-appeal on January 23, 2009. Then, Bernstein filed his docketing statement in our court. However, on March 20, 2009, Bernstein filed a motion in the trial court to dismiss his appeal under Illinois Supreme Court Rule 309 (134 Ill. 2d R. 309). On March 31, 2009, the trial court entered an order granting Bernstein's motion dismissing the appeal and specifically stating that Grazian's cross-appeal remained pending.

Later, on May 14, 2009, Bernstein filed a motion in our court seeking to vacate the trial court's dismissal, thereby reinstating his appeal. In his motion, Bernstein's attorney stated that she

---

[4]We note for the record that, initially, Grazian alluded to an objection to our jurisdiction in his opening brief on appeal, but did not argue it; Bernstein did not address the issue in his reply brief. Consequently, at the outset of oral argument heard in this case on May 11, 2010, we entered an order directing Bernstein to file a supplemental brief on the issue of appellate jurisdiction by May 14, 2010, and allowing Grazian to file a responsive brief solely on this issue by May 19, 2010. The parties filed their briefs with this court pursuant to that order, and we have reviewed them accordingly.

8

had mistakenly petitioned the trial court to dismiss the cause and that her client instead wished to go forward with the appeal. On June 1, 2009, a justice of our court allowed Bernstein's motion and reinstated his appeal. Grazian immediately filed a motion in our court to vacate this order, but the same justice denied this.

In his supplemental brief, Bernstein argues that jurisdiction for his direct appeal is properly before our court for two reasons. First, relying on Illinois Supreme Court Rule 366 (155 Ill. 2d R. 366), and Boone v. Evanston Hospital, 225 Ill. App. 3d 195 (1992), he claims that the only procedural step in the appellate process is the filing of a timely notice of appeal and, because his notice was timely filed, our court had the discretion to vacate the trial court's order and to allow his appeal. Second, he claims that, even were this not true, Grazian's failure to object to Bernstein's motion to vacate and his continued "participation without objection in proceedings which were inconsistent with [his] claim that jurisdiction was lost" revested our court with jurisdiction to hear the direct appeal. In response, Grazian argues in his supplemental brief that our court lost jurisdiction over Bernstein's appeal once the trial court entered its order dismissing it under Rule 309 pursuant to Bernstein's own motion, and nothing that occurred after this revested jurisdiction with our court.

Upon our examination of the record and the pertinent law here, we agree with Grazian and hold that we do not have jurisdiction over Bernstein's direct appeal.

We begin by noting that there is little case law regarding Rule 309; we certainly have found no precedent directly on point with the instant circumstances. However, the procedural mechanics surrounding Rule 309 are, to us, clear. That rule states:

9

No. 1-09-0149

"Before the record on appeal is filed in the reviewing court, the trial court may dismiss the appeal of any party (1) on motion of that party or (2) on stipulation of the parties." 134 Ill. 2d R. 309.

First, we conclude, and neither party disputes, that the trial court had authority to grant Bernstein's motion and to dismiss his appeal. Even though Bernstein had filed a notice of appeal and a docketing statement before filing his motion in the trial court, he had not yet filed the record on appeal in our court. Therefore, when he moved to dismiss his own appeal in the trial court under Rule 309, the trial court properly followed that rule and granted his motion.

At this point, the question became, which court now had jurisdiction over the cause? Bernstein insists our court did and, thus, when the appellate justice granted his motion to vacate the trial court's dismissal of his appeal, his case was properly reinstated in our court. This is incorrect.

Our courts have declared that a trial court's order dismissing an appeal pursuant to Rule 309 is a final order. See People v. Baskin, 213 Ill. App. 3d 477, 483 (1991); accord Kjellberg v. Muno, 340 Ill. App. 133, 137 (1950); see also Physicians Insurance Exchange v. Jennings, 316 Ill. App. 3d 443, 456 (2000) (trial court's Rule 309 dismissal "was final and appealable"). Once such an order is entered, the reviewing court no longer has jurisdiction over the matter, even if a notice of appeal has been filed there; rather, jurisdiction revests with the trial court. See, *e.g.*, People v. Hook, 248 Ill. App. 3d 16 (1993) (appellate court stripped of jurisdiction when the defendant timely filed motion to reduce sentence after previously filing notice of appeal, as the motion to reduce sentence was implicitly a motion to dismiss the appeal).

10

No. 1-09-0149

As Grazian cites, we find <u>Physicians Insurance</u> and its reliance on <u>Rickard v. Pozdal</u>, 31 Ill. App. 3d 542 (1975), instructive here. In <u>Rickard</u>, the plaintiff obtained a default judgment and the defendant filed a notice of appeal. However, later, the defendant filed a motion to dismiss her appeal, and the trial court granted this. In discussing which court had jurisdiction over the cause regarding its subsequent progression, the <u>Rickard</u> court explained that, "[s]ince the jurisdiction of the appellate court attaches upon the filing of the notice of the appeal, it follows that upon dismissal of the appeal, the circuit court is revested with jurisdiction over the cause." <u>Rickard</u>, 31 Ill. App. 3d at 546. In reaching this conclusion, the <u>Rickard</u> court looked to Rule 309 and the Illinois Supreme Court's declaration in <u>People v. Bristow</u>, 391 Ill. 101, 112 (1945):

" 'Where an appeal is voluntarily dismissed by the appellant, the effect is to remove the appeal and the cause *** from the jurisdiction of the [appellate] court. *** It le[aves] the appellant in the same position it was before the appeal was filed. The rights of the parties [are] in nowise affected by reason of the fact that the appeal ha[s] been taken and subsequently dismissed ***. It le[aves] the judgment of the circuit court in full force and effect, the same as if no appeal had ever been taken.' " <u>Rickard</u>, 31 Ill. App. 3d at 546, quoting <u>Bristow</u>, 391 Ill. at 112.

Likewise, and more recently, our own court employed these same concepts in <u>Physicians Insurance</u>. There, the trial court essentially held that a physician was entitled to coverage under the plaintiff's insurance policy. The plaintiff filed a notice of appeal in our court but, upon stipulation of the parties, then filed a motion in the trial court to dismiss the appeal pursuant to Rule 309. The trial court granted this and, later, the plaintiff filed a motion to vacate the trial

11

No. 1-09-0149

court's order. As in <u>Rickard</u>, in discussing which court had jurisdiction over the progression of the cause, we noted that, when the trial court properly dismissed the plaintiff's appeal pursuant to Rule 309, the reviewing court lost jurisdiction; rather, jurisdiction had revested with the trial court. See <u>Physicians Insurance</u>, 316 Ill. App. 3d at 452. In reaching this conclusion, we, too, cited <u>Bristow</u> and applied its principles. See <u>Physicians Insurance</u>, 316 Ill. App. 3d at 455. From this, we held that, with the trial court's dismissal of the plaintiff's appeal, its judgment in the case stood as the final, appealable order, and the parties were in the same position as if the appeal had never been filed; accordingly, the only action the plaintiff could take at this point was to file another notice of appeal and, until then, jurisdiction lay with the trial court. See <u>Physicians Insurance</u>, 316 Ill. App. 3d at 456.

Applying these principles to the instant cause, it becomes clear why we do not have jurisdiction over Bernstein's appeal. Once the trial court properly dismissed Bernstein's appeal pursuant to Rule 309 upon his own motion, it was as if Bernstein had never filed a notice of appeal in our court. Instead, as <u>Physicians Insurance</u>, <u>Rickard</u>, and <u>Bristow</u> make evident, jurisdiction revested with the trial court. The only recourse for Bernstein, then, to move jurisdiction to our court was to petition the trial court to vacate its dismissal or, as dictated in <u>Physicians Insurance</u>, file another notice of appeal from the original judgment in the cause--some similar action taken within 30 days of the trial court's final and appealable order dismissing his appeal. See, *e.g.*, <u>State Farm Fire & Casualty Co. v. John J. Rickhoff Sheet Metal Co.</u>, 394 Ill. App. 3d 548, 556 (2009) (party has 30 days following entry of final, appealable order in which to appeal). Bernstein's decision to, instead, move our court to vacate the trial court's dismissal of

12

his appeal, and the appellate justice's subsequent grant of this motion reinstating his appeal, was improper, as was the fact that Bernstein did not do anything within the 30-day window, waiting more than a month and a half to even file his motion.

Bernstein's reliance on Rule 366 and <u>Boone</u> for his contention that jurisdiction over his cause has been established in our court is wholly misplaced. So, too, is his insistence that Grazian's actions, or lack thereof, somehow revested jurisdiction in our court.

First, while Bernstein is correct that Rule 366 grants this court broad discretionary powers, including "the powers of amendment of the trial court" and to "enter any judgment and make any order that ought to have been given or made" (155 Ill. 2d Rs. 366(a)(1), (a)(5)), we must, as Grazian points out, first have jurisdiction to exercise these powers. As noted above, the appellate justice in this cause simply did not have jurisdiction over the matter to employ Rule 366 and reinstate the appeal in the first place.

Next, <u>Boone</u> is distinguishable and does not support Bernstein's argument. In <u>Boone</u>, the plaintiff filed her notice of appeal, but never filed the record with our court within the prescribed time required under Illinois Supreme Court Rule 326 (155 Ill. 2d R. 326). The defendant, therefore, moved in our court to dismiss the appeal, and we granted that motion. Later, however, the plaintiff filed a motion to reinstate her appeal, along with leave to file her brief and the record, and we granted her motion. When the defendant claimed that this was erroneous and that the appeal should be dismissed, we disagreed and refused to reverse our decision to reinstate the appeal. See <u>Boone</u>, 225 Ill. App. 3d at 197.

The instant cause is nothing like <u>Boone</u>. Primarily, that case in no way involved Rule 309

No. 1-09-0149

or a question of revestment of jurisdiction in the trial court. Indeed, the trial court was never involved at all. Instead, the only court involved in Boone was the appellate court. That is, upon judgment in her cause, the plaintiff filed a notice of appeal in our court, but then failed to ever file a record. Because of this, the defendant filed a motion--again, in our court--to dismiss the appeal pursuant to Rule 326. We, and not the trial court, granted the motion, but then chose to grant the plaintiff's subsequent motion to reinstate her appeal. Thus, the challenge on appeal was a challenge for our court to review our own decision to reinstate the appeal. Unlike in the instant cause, then, Boone did not involve an appellate challenge to a trial court's procedural decision, or vice versa. In addition, we made clear in Boone that a valid notice of appeal existed at the time of the decision. That is, the plaintiff in Boone had properly and timely filed her notice of appeal and, pursuant to Illinois Supreme Court Rule 301 (155 Ill. 2d R. 301), we did not need to reverse ourselves and dismiss the appeal; rather, we had appellate jurisdiction to choose to hear the appeal on its merits, which we did. However, in the instant case, we are not dealing with the failure to timely file a record under Rule 326. Instead, we are dealing with the dismissal of an appeal pursuant to Rule 309. This is critical because, as we have already discussed, the dismissal of an appeal under this rule puts the parties back in the same positions they would have been as if a notice of appeal had never been filed. See Bristow, 391 Ill. at 112; Physicians Insurance, 316 Ill. App. 3d at 455; Rickard, 31 Ill. App. 3d at 546. Accordingly, when the trial court granted Bernstein's motion to dismiss his appeal, no valid notice of appeal remained of record upon which we could base our jurisdiction.

Finally, we cannot agree with Bernstein's insistence that, regardless of all this, Grazian's

14

inaction here somehow vested jurisdiction with our court. Bernstein claims that Grazian should have filed a timely objection to his motion to vacate the dismissal of his appeal, or could have filed a motion to dismiss the appeal for lack of jurisdiction and/or sought *mandamus* or a supervisory order from the Illinois Supreme Court. However, it is well established that appellate jurisdiction cannot be conferred by *laches*, agreement, waiver or estoppel. See <u>Physicians Insurance</u>, 316 Ill. App. 3d at 453, citing <u>Currie v. Lao</u>, 148 Ill. 2d 151 (1992); accord <u>Bernhauser v. Glen Ellyn Dodge, Inc.</u>, 288 Ill. App. 3d 984, 989 (1997). This includes the failure of one party, *i.e.*, Grazian, to call the appellate court's attention to a jurisdictional defect. See <u>Board of Education of the City of Chicago v. Chicago Teachers Union, Local 1, American Federation of Teachers</u>, 26 Ill. App. 3d 806, 813 (1975). Regardless of Grazian's action or inaction in this cause, Bernstein's motion filed in this court to vacate the dismissal of his appeal should never have been granted and his appeal should never have been reinstated under the rules we have just enunciated. It was, therefore, incumbent upon the justice of this court hearing that motion to deny it, and not upon Grazian to object to it.

Ultimately, the question of our jurisdiction in every case "is always open and we may of our own motion dismiss an action where want of jurisdiction appears." <u>Board of Education</u>, 26 Ill. App. 3d at 813. Bernstein's direct appeal in the instant cause provides a prime example of this principle. Accordingly, as we have no jurisdiction to hear his appeal, we dismiss it.

## II. Grazian's Cross-Appeal

We now turn to Grazian's cross-appeal. Grazian raises two contentions for our review. First, he argues that the trial court improperly found that Bernstein did not violate his fiduciary

duty and, second, he argues that, while *quantum meruit* was the appropriate legal doctrine for the trial court to apply, it improperly held that Bernstein was entitled to 10% of the fees on B&G's open cases.

The trial court made clear in its March 31, 2009, order that, while it was dismissing Bernstein's appeal pursuant to his own motion, Grazian's cross-appeal remained pending. Before addressing the merits of the cross-appeal, however, we note for the record that Bernstein alleges in his reply brief before this court that Grazian failed to follow proper appellate court rules. Bernstein cites Grazian's failure to file a docketing statement as required by Illinois Supreme Court Rule 312 (210 Ill. 2d R. 312); his failure to include a copy of the notice of cross-appeal in the appendix to his brief on appeal as required by Illinois Supreme Court Rule 342 (210 Ill. 2d R. 342); and his failure to raise his second argument, which was not an argument in response to Bernstein's brief, in his notice of cross-appeal as required by Illinois Supreme Court Rule 303(b)(2) (210 Ill. R. 303(b)(2)). Later in his reply brief, however, Bernstein acknowledges that Grazian did file his notice of cross-appeal within 10 days of his (Bernstein's) filing of his notice of appeal. Yet, despite this, Bernstein hints at the notion that we should not review Grazian's cross-appeal, alluding that while he "cannot say with any certainty that [these] failures *** defeat[ our] jurisdiction," this may indeed be the case.

We disagree and find that we have jurisdiction over Grazian's entire cross-appeal. First, while Rule 312 states that all appellants, including cross-appellants, are to file a docketing statement in our court, that rule does not provide any ramification for the failure to do so, let alone the prohibition of our jurisdiction over the matter for this reason. See, *e.g.*, 210 Ill. 2d R.

16

312. Particularly, where the cross-appellant has followed our other, and more crucial, rules of procedure, we have not and will not dismiss a cause for lack of jurisdiction simply because a docketing statement was not filed. Bernstein points us to no legal precedent, and we find none, advocating a position to the contrary.

Likewise, we do not find Grazian's failure to include a copy of his notice of cross-appeal in the appendix of his brief on appeal to defeat our jurisdiction. This allegation, too, amounts to nothing more than pedantic fault-finding on Bernstein's part. As with Rule 312, Rule 342 does not prohibit our jurisdiction for the failure to append one's notice of cross-appeal to the appendix of his brief. See, *e.g.*, 210 Ill. 2d R. 342. What is most important here is that Grazian filed his notice of cross-appeal in our court[5] and the notice is included in the record of this cause, which is to be our focus--not a brief's appendix. See Walczak v. Onyx Acceptance Corp., 365 Ill. App. 3d 664, 672 (2006) (documents appellate court may consider must be included in record, and not simply in appendix); Wilson v. Brant, 374 Ill. App. 3d 306, 308 (2007) (fact that notice of appeal was not in appendix but was in record upheld appellate review of cause's merits).

Finally, with respect to Bernstein's insistence that we have no jurisdiction over Grazian's second argument because he violated Rule 303(b)(2) when he failed to raise it in his notice of cross-appeal, we find that it cannot stand. Bernstein alleges that Grazian did not specify in his notice that he was appealing from the trial court's determination that Bernstein was entitled to an amount equal to 10% of the fees pursuant to *quantum meruit* and, as this "nonspecified judgment" does not relate back to the one Grazian did specify (*i.e.*, the trial court's holding that Bernstein did

---

[5]Grazian also filed his notice of cross-appeal in the trial court.

17

not violate his fiduciary duty), he cannot argue it now. Bernstein, however, mischaracterizes Grazian's notice of cross-appeal. The notice states that Grazian is appealing from the trial court's "December 11, 2008, entr[y] of judgment in favor of [Bernstein] and against [Grazian] (for breach of fiduciary duty ***), and the order of December 17, 2008." The record reflects that the December 11, 2008, entry of judgment was based on the court's colloquy referencing *both* the fiduciary duty issue and the 10% award. In addition, the December 17, 2008, written order of the trial court specifically details the 10% award to Bernstein, sets out the resulting monetary amount deciphered by the court, and concludes by noting its previous holding that Bernstein did not violate his fiduciary duty. Logically, when Grazian stated in his notice of cross-appeal that he was appealing from the December 17, 2008, order, he clearly was appealing the 10% finding, as well as the fiduciary duty finding. This is in line with his consistent assertion during the progression of this case that Bernstein merited no fees from the open B&G cases. Accordingly, we find that Grazian's notice of cross-appeal makes clear, with sufficient specificity, that he appealed from the trial court's determinations regarding both issues he now presents.

Having determined the propriety of our jurisdiction, we now address the merits of Grazian's cross-appeal.

### A. Bernstein's Fiduciary Duty

As noted, Grazian's first contention on cross-appeal is that the trial court erred when it held that Bernstein did not violate his fiduciary duty. Returning for a moment to the facts of this cause, we must discuss some additional information regarding events that occurred prior to the December 2005 dissolution of B&G, which are pertinent to this contention.

18

No. 1-09-0149

In 2004, following the creation of the 2003 compensation Agreement between Bernstein, Grazian and Volpe but prior to Grazian's and Volpe's decision to leave B&G, Bernstein formed a separate legal practice known as Isadore M. Bernstein & Associates, P.C. (IMB). This practice concentrated solely on medical malpractice claims. Essentially, when medical malpractice claims were received, they would be transferred to IMB, and Bernstein, as IMB's sole owner, would then refer the cases to other attorneys in Illinois, Indiana or Wisconsin. Such cases were to have nothing to do with B&G's business, and Grazian (and Volpe) did not work on these claims or receive any income from them.

Regarding this, Bernstein testified that B&G had long been receiving medical malpractice claims. When he hired Grazian in 1998, it was understood between them, and it was stated in Grazian's hiring contract, that Grazian was not to do any medical malpractice work, but was only to work on B&G's personal injury cases. Bernstein averred that, as neither he nor Grazian had experience with medical malpractice cases, he (Bernstein) would just refer these inquiries to other, outside attorneys. Bernstein testified that by 2003, following the creation of the Agreement, he was working for B&G 6 to 7 days a week for approximately 60 to 70 hours. He spent the vast majority of this time, or 95%, on B&G's personal injury cases writing interrogatories, settling cases, making phone calls and otherwise preparing cases for court, at which point Grazian would take them over. He averaged about $200,000 in fees for B&G every year from 1998 to 2003.

Bernstein averred that, in 2004, following years of advertising for B&G, he decided to create two separate television commercials: one was for B&G and mentioned specifically the practice's personal injury and workers' compensation experience; the other was for IMB and

19

mentioned that practice's medical malpractice work. Bernstein testified that while the 2003 Agreement required him, Grazian and Volpe to each pay an equal third of B&G's advertisement costs, he paid out of his own pocket for the IMB commercial and that this was clearly a separate advertisement which he, himself, funded. Bernstein stated that he told Grazian he was going to advertise for IMB before the commercial began to run, and that Grazian told him this was fine.

Bernstein further testified that, once the commercials started to run, he received a lot of phone calls regarding both personal injury and medical malpractice inquiries. He referred all the personal injury claims to Grazian. Regarding the medical malpractice claims, he stated that, while there were hundreds of new inquiries, he spent no more than 1 to 1½ hours per day on these, or 5% of his time; the remainder of his time was spent on B&G personal injury cases, particularly on interrogatories. And, while he had B&G secretaries working on some of the facets of the medical malpractice inquiries such as typing letters, transcribing interviews and answering phone calls, this did not amount to a lot of work. Finally, Bernstein acknowledged that the fees he recovered for B&G declined to $40,000 in 2004 and to $800 in 2005. However, he specifically testified that this was not due to a decline in his productivity for B&G or because he was spending time on IMB cases but, rather, because he was now working mainly on B&G personal injury interrogatories due to the influx of B&G cases from the advertisements.

In contrast to Bernstein, Grazian testified that, while the advertisements resulted in a tremendous amount of business for B&G, this began to create management issues at the firm because the appropriate amount of time could not be spent on each case in light of the increasing volume of claims. Grazian therefore asked Bernstein to stop advertising for a time, which

Bernstein did. Grazian averred that he later discovered, and had never agreed, that Bernstein formed IMB and was advertising on television for that firm. While he acknowledged that the IMB commercial was wholly separate from B&G and referred only to medical malpractice claims, Grazian became upset because Bernstein was using B&G's phone number, staff, office space, secretarial services, supplies, and legal insurance to deal with these claims, for which he and Volpe were each paying one-third under the Agreement but were entitled to nothing recovered by Bernstein. Grazian testified that IMB was creating a major disruption to the operation of B&G and resulting in a clear lack in productivity for B&G on the part of Bernstein, as exhibited by the sharp decline in fee income he was generating for B&G by 2005.

Based on all this, Grazian brought suit against Bernstein for breach of fiduciary duty. Grazian claimed that, due to their relationship as law partners and as required in the documentation Grazian and Bernstein had signed when forming B&G, Bernstein was required to devote his time, attention and efforts to B&G, perform faithfully for the firm and give honest, loyal and cooperative service--all of which he violated when he created IMB. The trial court, however, ultimately disagreed. It noted that while it was true that, by virtue of their relationship via B&G, Bernstein owed Grazian a fiduciary duty, Bernstein had not breached this duty.[6]

Grazian now argues that the evidence presented at trial overwhelmingly showed that

---

[6]As noted earlier, part of Bernstein's suit against Grazian, too, claimed a breach of fiduciary duty. The court here found that, just as Bernstein owed Grazian a fiduciary duty, Grazian, too, owed Bernstein the same. The court then held that neither party violated his duty to the other, and dismissed both claims.

21

Bernstein created a competing medical malpractice venture and diverted all of his time and resources away from B&G. He claims that the trial court ignored this "undisputed" evidence and the resulting financial injury he suffered, and that its holding that Bernstein did not breach the fiduciary duty he owed was clearly against the manifest weight of the evidence.

To prevail on a claim for breach of fiduciary duty, Grazian was required to prove the existence of such a duty between he and Bernstein, that Bernstein breached this duty, and that Grazian suffered damages proximately caused by that breach. See Covinsky v. Hannah Marine Corp., 388 Ill. App. 3d 478, 489 (2009). We examine the trial court's determination here that Bernstein did not breach his fiduciary duty pursuant a manifest weight of the evidence standard of review. See 1515 North Wells, L.P. v. 1513 North Wells, L.L.C., 392 Ill. App. 3d 863, 874 (2009), citing Dowd & Dowd, Ltd. v. Gleason, 352 Ill. App. 3d 365, 373 (2004). Under this standard, we may only conclude that the trial court's determination was against the manifest weight of the evidence where, upon review of all the evidence in the light most favorable to Bernstein as the prevailing party, "an opposite conclusion is clearly apparent or the [trial court's] finding is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary and unsubstantiated by the evidence." Joel R. v. Board of Education of Mannheim School District 83, 292 Ill. App. 3d 607, 613 (1997). As the trier of fact here, the trial court was responsible for resolving any factual disputes, judging the credibility of the witnesses, determining the weight to afford their testimony and deciphering contradicting evidence. See Joel R., 292 Ill. App. 3d at 613. Ultimately, its "findings of fact are 'not against the manifest weight of the evidence merely because the record might support a contrary decision' " (Dowd, 352 Ill. App.

22

No. 1-09-0149

3d at 373, quoting Graham v. Mimms, 111 Ill. App. 3d 751, 767 (1982)), and we are not to overturn these simply because we may disagree with them (see Addison Insurance Co. v. Fay, 232 Ill. 2d 446, 452 (2009)).

In light of the record on appeal and pursuant to this deferential standard, we cannot say that the trial court's determination here that Bernstein did not violate his fiduciary duty to Grazian was against the manifest weight of the evidence.

Regarding the creation of IMB in 2004 and Bernstein's work from that time until the dissolution of B&G in 2005, the trial court was principally faced with conflicting testimony from Bernstein and Grazian. Grazian was adamant that Bernstein secretly formed IMB without his knowledge or agreement. He testified that he became upset because, in addition to preexisting management issues at B&G, Bernstein was using B&G resources, staff, supplies, space and insurance to promote and operate IMB--items for which he was required to pay one-third under the Agreement while receiving no income from IMB's business. Grazian averred that IMB was creating a major disruption to B&G because Bernstein was spending all his time and effort on IMB, as exhibited by the sharp reduction in fees he brought into B&G in 2004 and 2005.

Bernstein, however, testified that he never secretly began IMB, but had long been receiving medical malpractice cases into B&G and referring them out. He stated that Grazian knew this from the moment he was hired and that it was referenced in his hiring contract. Bernstein stated that, when the issue of advertising arose in 2004, he told Grazian that he would be advertising separately for IMB, and Grazian agreed. Bernstein further testified that, even though he began receiving more medical malpractice inquiries for IMB, he only spent 1 to 1½

23

hours, or 5% of his time, each day on IMB matters and the remainder on B&G's cases. He acknowledged the decrease in the fees he brought into B&G during this time, but explained that this had nothing to do with a decline in his productivity for B&G or a distraction with IMB business. Rather, he testified that this was because he was now spending the majority of his time answering interrogatories on B&G's personal injury cases, as their volume, too, had increased due to the television advertising.

From this, the only concept that is clear to us is that, contrary to Grazian's insistence, the evidence here is not totally "undisputed." Grazian testified that Bernstein abandoned B&G for IMB and used B&G resources to further his competing venture; Bernstein testified that he continued to work for B&G as hard as he had before and that IMB did not divert any of his time devoted to B&G. We do note some factual items, however, that are undisputed. Grazian and Bernstein both testified that while Bernstein had been averaging about $200,000 in fees per year for B&G from 1998 to 2003, this declined to $40,000 in 2004 and to $800 in 2005. However, Grazian never presented any concrete evidence to show that this was because Bernstein was concentrating more on IMB business than B&G business. Moreover, Grazian and Bernstein both testified that all the advertisements for IMB in 2004 and 2005 were paid solely by Bernstein. Volpe, too, confirmed this in his testimony. Volpe also testified that there was a considerable difference in the number of clients coming into B&G after the advertisements started. At first, there were relatively few medical malpractice inquiries and more personal injury and workers' compensation claims, but then more medical malpractice inquiries after B&G's advertisements stopped in 2004. Yet, it was Grazian, as per his own testimony, who demanded the cessation of

24

B&G's advertisements, while IMB's advertisements continued.

Ultimately, the trial court concluded that while Bernstein owed Grazian a fiduciary duty, he did not violate it. It acknowledged that, based on the evidence, Bernstein's contributions to B&G had diminished but, at the same time, made clear that the evidence showed Bernstein had still been contributing to B&G. Most critically, the court specifically found that both Grazian and Bernstein were credible witnesses. Accordingly, the conflicts in their testimony regarding Bernstein's work for and devotion to B&G were solely for the trial court to decipher, and we cannot now usurp that function. While Grazian presents some facts in the record that contradict the trial court's decision, we simply cannot say that, when viewed in the light most favorable to Bernstein, as we must, the opposite conclusion is clearly apparent or that the court's finding was arbitrary, unsubstantiated, palpably erroneous or wholly unwarranted.

Therefore, we hold that the trial court's determination that Bernstein did not breach his fiduciary duty owed to Grazian was not against the manifest weight of the evidence.[7]

---

[7]We wish to clarify for the record the type of fiduciary duty involved herein. The law is clear that employees are held to different standards with respect to fiduciary duties than are corporate officers. Generally, an employee's duty is one of loyalty and noncompetition, while an officer's duty is not to actively exploit the company for his personal gain or hinder its ability to continue its business. See, *e.g.*, Cooper Linse Hallman Capital Management, Inc. v. Hallman, 368 Ill. App. 3d 353 (2006). Lest any confusion arise, documentation in the record makes clear that Bernstein was actually an employee of B&G, just as was Grazian, and not an officer and, therefore, this cause deals with the former of these duties, not the latter.

No. 1-09-0149

## B. The 10% *Quantum Meruit* Award

Grazian's second, and final, contention on cross-appeal is that the trial court erred when it awarded Bernstein 10% of the fees on B&G's open cases. As noted, Grazian does not dispute the trial court's determination that *quantum meruit* was the proper avenue to any potential recovery for Bernstein. Rather, he argues that, under this legal doctrine, Bernstein was not entitled to any portion of the fees. Grazian claims Bernstein did not supply the court with any evidence required for recovery under *quantum meruit* and, therefore, the court's decision was improper.

Just as Grazian's prior contention on cross-appeal, we examine the trial court's grant of the 10% *quantum meruit* award to Bernstein pursuant to a manifest weight of the evidence standard of review. See Rhoter v. Passarella, 246 Ill. App. 3d 860, 866 (1993). " 'To recover under a *quantum meruit* theory, the plaintiff must prove that: (1) he performed a service to benefit the defendant, (2) he did not perform this service gratuitously, (3) [the] defendant accepted this service, and (4) no contract existed to prescribe payment for this service.' " K. Miller Construction Co. v. McGinnis, 394 Ill. App. 3d 248, 255 (2009), quoting Installco, Inc. v. Whiting Corp., 336 Ill. App. 3d 776, 781 (2002), citing Canel & Hale, Ltd. v. Tobin, 304 Ill. App. 3d 906, 913 (1999). *Quantum meruit*, which literally means "as much as he deserves," describes a cause of action seeking recovery for the reasonable value of services non-gratuitously rendered, but where no contract exists to dictate payment. See K. Miller, 394 Ill. App. 3d at 255. However, " ' "[t]he mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor." ' " Hayes Mechanical, Inc. v. First Industrial, L.P., 351 Ill. App. 3d 1, 9 (2004), quoting Rutledge v. Housing Authority of the City of East St. Louis, 88 Ill. App. 3d

26

1064, 1069, quoting Restatement of Restitution §1, Comment *c* (1937). Instead, the burden is on the provider, who "must show that valuable services" were furnished by him, that they were received by the defendant, and that the circumstances are such that it would be unjust for the defendant to retain these without paying for them. See Hayes Mechanical, 351 Ill. App. 3d 1, 9 (2004). Accordingly, "the measure of recovery is the reasonable value of work" (Hayes Mechanical, 351 Ill. App. 3d at 9), and, in order to recover under this doctrine, the provider must prove that the services performed were "of some measurable benefit to the defendant" (Van C. Argiris & Co. v. FMC Corp., 144 Ill. App. 3d 750, 753 (1986)).

In order to recover under *quantum meruit*, then, Bernstein, as the provider, had the burden to show that he furnished some sort of valuable service to Grazian regarding the open B&G cases which would have been unjust for Grazian to retain. More critically, however, while Bernstein may not have been required to provide a line-by-line detailing of all his efforts, he did need to, at the very least, introduce some evidence specific enough to prove the reasonable value of the benefit Grazian allegedly received. See Rhoter, 246 Ill. App. 3d at 867. We find that Bernstein never presented any such evidence upon which the trial court could substantiate its award and, thus, that the award was against the manifest weight of the evidence.

The trial court awarded Bernstein 10% of the recoverable fees on all open B&G cases G&V assumed after B&G's dissolution. However, as Grazian points out, Bernstein testified that he did not go to court, take depositions, or argue motions on any B&G cases, let alone those that were transferred to G&V after B&G's dissolution. Nor did Bernstein review B&G case records or conduct interviews with expert witnesses. His testimony indicated only that he brought cases

27

into B&G, spoke to clients and adjustors, and worked on interrogatories. Apart from these extremely generalized statements regarding "work" he did at B&G, no evidence was ever provided to demonstrate anything more, particularly regarding the open B&G cases. It is not known the amount of time Bernstein worked on cases in general or on the open cases at issue. Nor did he provide any evidence to show, for example, the hourly rate he charged for his work. Moreover, Bernstein further acknowledged in his testimony his sharp decline in fees he brought into B&G as income for 2004 and 2005.

That Grazian may have benefitted in some way from Bernstein's "work" is not, in and of itself, enough to support an award to Bernstein under *quantum meruit*. We believe this is the only explanation for the trial court's award here. In fact, it was only when the trial court was in the midst of describing Bernstein's "diminished" and "deteriorated" contribution to B&G--which it specifically referred to as a "liability" and "burden" upon the practice--that it could say nothing more than Bernstein did contribute "something." However, under the law we have just discussed, such a statement is not enough to support an award under the legal doctrine of *quantum meruit*. Instead, Bernstein was required to provide at least some evidence to show the reasonable value of his work on the open B&G cases and/or that his work on these provided a measurable benefit to Grazian. Upon our review of the record, we simply do not find that Bernstein did so in any manner to support or substantiate the trial court's 10% award in his favor. Tellingly, the trial court itself admitted in its colloquy on this issue that it was "very difficult from the evidence presented" to decipher such an award.

In light of all this, we must find that the *quantum meruit* award was against the manifest

28

weight of the evidence and, therefore, we vacate and dismiss this portion of the judgment.

CONCLUSION

Accordingly, for all the foregoing reasons, we dismiss Bernstein's direct appeal for lack of jurisdiction; regarding Grazian's cross-appeal, we affirm that portion of the trial court's judgment holding that Bernstein did not violate his fiduciary duty, but vacate that portion of its judgment awarding Bernstein 10% of the fees on B&G's open cases under *quantum meruit*.

Appeal dismissed; cross-appeal affirmed in part and vacated in part.

TOOMIN, P.J., and HOWSE, J., concur.

No. 1-09-0149

| | |
|---|---|
| Please use the following form | Bernstein and Grazian, P.C., and The Estate of Isadore M. Bernstein, |
| | Plaintiffs-Appellants and Cross-Appellees, |
| | v. |
| | Grazian and Volpe, P.C., and John Leonard Grazian, |
| | Defendants-Appellees and Cross-Appellants |
| | (Richard S. Volpe, |
| | Defendant). |

|  | |
|---|---|
| Docket No. | No.  1-09-0149 |
| COURT | Appellate Court of Illinois |
| Opinion Filed | First District, FIFTH Division |
|  | June 25, 2010 |
|  | (Give month, day and year) |

JUSTICE JAMES FITZGERALD SMITH DELIVERED THE OPINION OF THE COURT:

| JUSTICES | TOOMIN, P.J., and HOWSE, J.  concur. |
|---|---|

Lower Court and Trial Judge(s) in form indicated in margin:

| APPEAL from the Circuit Court of Cook County; the Hon_____ Judge Presiding. | Appeal from the Circuit Court of Cook County. The Hon. WILLIAM MAKI,  Judge presiding. |
|---|---|

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel.  Indicate the word r NONE if not represented.

| FOR APPELLANTS John Doe, of Chicago | |
|---|---|
| For APPELLEES,  : | APPELLANTS: LESLIE J. ROSEN, ATTORNEY AT LAW, Chicago, IL Leslie J. Rosen |
| Smith and Smith of Chicago, | APPELLEES: GRAZIAN & VOLPE, P.C., Chicago, IL Matthias D. Gill; O'CONNOR LAW GROUP, L.L.C., Chicago, IL Bryan J. O'Connor |
| (Joseph Brown, of counsel) Add attorneys for third-party appellants and/or appellees. | |