2023 IL App (1st) 211638

No. 1-21-1638

Opinion filed March 16, 2023

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| ANDREW W. LEVENFELD AND ASSOCIATES, LTD., and STEPHEN J. SCHLEGEL, LTD., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) | |
| | ) | No. 17 CH 15055 |
| v. | ) ) | |
| MAUREEN V. O'BRIEN and DANIEL P. O'BRIEN III, | ) ) ) | Honorable Cecilia A. Horan, |
| Defendants-Appellants. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Hoffman and Martin concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiffs, two law firms, sued former clients, defendants Maureen O'Brien (Maureen) and

Daniel O'Brien III (Dan), to recover attorney fees on the basis of *quantum meruit* for plaintiffs'

services in an estate dispute. Plaintiffs contended, *inter alia*, that they were entitled to recover the

value of their legal services with reference to their contingency fee agreement with defendants

because defendants fired plaintiffs only two months before defendants, represented by new

counsel, settled their dispute with the other estate holders under terms similar to those negotiated

by plaintiffs prior to their dismissal. However, the parties' contingency fee agreement failed to

specify how the plaintiffs would split the contingency fee, an omission that violates Illinois Rules of Professional Conduct of 2010 Rule 1.5(e) (eff. Jan. 1, 2010).

¶ 2    The trial court found that plaintiffs were entitled to a reasonable fee and that the reasonable fee in this case was the contingency fee agreed upon by the parties, minus the amount defendants paid successor counsel.

¶ 3    On appeal, defendants argue that the trial court erred (1) as a matter of law by basing plaintiffs' *quantum meruit* award on the contingency fee specified in a fee agreement that was unlawful and unenforceable because it violated Rule 1.5(e); (2) by finding that plaintiffs' services conferred a benefit on defendants; and (3) by finding that the reasonable value of plaintiffs' services was $1,692,390.60.

¶ 4    For the reasons that follow, we reverse the trial court's determination that the amount of the contingency fee was a reasonable fee for plaintiffs' services. However, we affirm the trial court's decision that plaintiffs' services conferred a benefit on defendants. We remand this cause for further proceedings on the reasonable value of plaintiffs' services.

¶ 5                          I. BACKGROUND

¶ 6    Stephen Schlegel is an attorney licensed to practice law in Illinois since 1969 and the owner of plaintiff, Stephen J. Schlegel, Ltd. Andrew Levenfeld is an attorney licensed to practice law in Illinois since 1973 and the owner of plaintiff, Andrew W. Levenfeld and Associates, Ltd.

¶ 7    Defendant Maureen is the daughter of Daniel O'Brien Sr. (Dan Sr.), who died in 2012, and Mary O'Brien (Mary), who died in 2013. Defendant Dan is the grandson of Dan Sr. and Mary. Both Dan Sr. and Mary had complex estate plans including a large number of properties and businesses. Defendants each owned a 25% interest in the cumulative O'Brien estate. Margaret

Schulze (Peggy), who is also a daughter of Dan Sr. and Mary, similarly owned a 25% interest in the estate assets. The final 25% of the O'Brien estate was owned by two sons of another of Dan Sr. and Mary's children.

¶ 8    Peggy was the sole executor of Dan Sr.'s estate. Peggy, her husband Richard Schulze (Richard), and Maureen were co-executors of Mary's estate. Accordingly, Peggy and Richard had almost complete control over the assets of the cumulative estate. By the summer of 2015, defendants were not receiving any income or other distributions from their interests in the estates. They sought legal counsel from Schlegel to monetize their interests in the estate assets. Because the case was complex, Schlegel informed them that he would accept the case only if Levenfeld also worked on it. Defendants agreed.

¶ 9    Neither defendant had the ability to pay ongoing legal fees, and each had substantial debt. While defendants had undisputed interests in the estate assets, it was uncertain whether they would ultimately be able to monetize those interests. Based on these circumstances, plaintiffs initially proposed a flat 15% contingency fee on any recovery. Defendants countered that the contingency fee should be 15% of the first $10 million recovered and 10% of any recovery above $10 million. Plaintiffs agreed. The relevant part of the agreement stated:

> "Clients agree to pay minimum attorneys fees calculable at an hourly rate of $300 per hour for [Levenfeld's] or [Schlegel's] time, $250 per hour for associate attorney time, and $85 per hour for paralegal or paraprofessional time.

*  *  *

The total fees to be charged shall be either 15% of the first $10,000,000 and 10% of any additional value of the assets recovered for the clients, or the amount of charges made for time expended, whichever is greater."

¶ 10 The agreement was finalized on October 29, 2015. Over the next 19 months, Levenfeld, Schlegel, Diola Xhaferri (an associate at Schlegel's firm), and nonattorney Hilary Rushe worked approximately 3000 hours on defendants' case. The work spanned multiple pieces of litigation, including actions in the probate and chancery divisions of the circuit court of Cook County, the United States District Court for the Northern District of Illinois, the First District Appellate Court, and in Berrien County, Michigan.

¶ 11 After several settlement offers and counteroffers had been proposed, Peggy, in May 2017, responded with an offer totaling $16.25 million that required Maureen to vacate her home, which was an estate asset. Peggy later withdrew her offer on May 10, 2017. Plaintiffs had recommended that a demand be made for $16.75 million with a provision for Maureen to remain in her home, but defendants did not authorize this demand. On May 25, 2017, defendants, in an e-mail from their new attorneys, terminated plaintiffs' representation. On July 21, 2017, defendants accepted a settlement for $16.85 million. Maureen was also allowed to stay in her home. Defendants paid successor counsel a flat fee of $500,000.

¶ 12 Plaintiffs sued defendants, relying on a theory of *quantum meruit* to recover attorney fees. Defendants moved for summary judgment, arguing, *inter alia*, that plaintiffs could not collect attorney fees because the attorney-client agreement violated Illinois Rules of Professional Conduct of 2010 Rule 1.5(e) (eff. Jan. 1, 2010) since Schlegel and Levenfeld failed to specify how they would divide the expected contingency fee.

¶ 13    The trial court denied the motion for summary judgment, finding that the Rule 1.5(e) violation was "not egregious, did not prejudice [defendants], and did not affect the administration of justice or public good." The trial court also recognized defendants' failure to dispute that they discharged plaintiffs after plaintiffs had expended 3000 hours in nine lawsuits over 19 months; that plaintiffs had secured a $16.25 million settlement offer; and that defendants almost immediately settled the case for between $16 million and $17 million while paying new counsel a flat rate. The trial court ultimately rejected defendants' argument as an attempt, unsupported by case law, to use public policy as a sword for personal gain.

¶ 14    At trial, Schlegel testified that Maureen approached him in the summer of 2015 about potentially representing her in connection with ongoing disputes concerning her family's properties, estates, and trusts. Schlegel reviewed thousands of documents and related court files to understand the parties and potential disputes. He learned that defendants were equity owners in the estates and trusts of Dan Sr. and Mary, who had accumulated a large number of properties and businesses, including nursing homes, restaurants, bars, a golf course, hotel, storage business, and a fast-food franchise. The assets were held in trusts, limited liability companies, limited partnerships, and one general partnership. Peggy was the sole executor of Dan Sr.'s estate. Peggy, Richard, and Maureen were each co-executors of Mary's estate. Peggy and Richard were married, which meant Peggy had nearly full control of each estate's assets.

¶ 15    When Maureen and Dan approached Schlegel, they were not receiving any income from their 25% shares in the estate assets. Neither was able to pay their bills at the time. Schlegel testified that the entire set of estate assets had an estimated value of $40 to $80 million dollars. The assets had been valued at $52 million for tax purposes. Schlegel testified that while Maureen

and Dan each had an undisputed interest in the estate assets, "huge roadblocks" prevented them from receiving any recovery on their interests. For example, Peggy could have continued to exclude defendants from any revenues. Also, if assets were not producing revenue and Peggy opted not to sell the assets, there would be no income to provide to anyone. Finally, the only way to monetize defendants' interests in the assets would be to convince a court to overturn the decisions of Dan Sr. and Mary, who had opted to place control primarily in Peggy's hands.

¶ 16    Schlegel testified that he introduced Levenfeld to defendants prior to entering into the retainer agreement. Schlegel explained that he would only represent defendants with Levenfeld's help. Schlegel had a strong background in chancery litigation, and Levenfeld had a strong background in estate administration issues. Schlegel testified that he made it clear to defendants that two lawyers from two different firms would be representing them. Schlegel agreed that the retainer agreement did not indicate how the fees would be split between the two firms. Schlegel explained that the fee split was unknown until it became clear later what work and how much each firm did. Schlegel testified that, at that point, the fee split would be determined based on time spent on the case and expertise.

¶ 17    The parties entered into the agreement on October 29, 2015. Schlegel explained that this was a contingency fee agreement that provided for compensation of 15% of the first $10 million recovered and 10% of any amount recovered over $10 million plus reasonable and necessary costs. The agreement also included what Schlegel described as a "disaster clause." The clause would only be implicated if the time spent on the case was more costly than the recovery under the contingency fee provision. Schlegel testified that the hourly rate structure was a "minimum fee" that constituted a "rough overhead reimbursement level." The provision was a "fallback" to cover

the attorneys' overhead if the case went on for a long period with no liquidation of defendants' interests. Schlegel felt the parties' agreement was "[m]ost reasonable."

¶ 18    Schlegel explained that the initial strategy was to file lawsuits to gather records and discovery. Plaintiffs also succeeded in having the estates changed from independent to supervised administrations. This required the executors to file reports and inventories with the courts, which would allow for the potential to remove executors for mismanagement. Plaintiffs also had Maureen resign as co-executor of Mary's estate so that Maureen could accuse the other co-executors, Peggy and Richard, of mismanagement, without the potential conflict of interest. Schlegel discussed various lawsuits that were brought both on behalf of defendants and against them by Richard and Peggy. Schlegel explained that plaintiffs brought lawsuits to put pressure on Richard and Peggy to resolve the parties' issues. Schlegel also recognized that some litigation was unsuccessful, such as attempts to remove Peggy and Richard as co-executors. Plaintiffs also were unsuccessful in appealing those decisions, with one appeal being dismissed for lack of jurisdiction and one appeal being affirmed on the merits. Other lawsuits remained pending up to the time plaintiffs were terminated.

¶ 19    Schlegel and Levenfeld both testified to the progression of the settlement negotiations. No offers had been received prior to plaintiffs' representation. In November 2015, Richard and Peggy offered Dan $6 million for his 25% interest. Dan rejected that offer. The parties then attempted to negotiate by divvying up the various pieces of real estate, but no deal came to fruition that way. In September 2016, Peggy made defendants an offer of $12 million, which defendants rejected. In April 2017, plaintiffs made a demand for $18.3 million. Peggy responded with an offer of $15.44 million. Defendants rejected that offer and authorized plaintiffs to make a demand of $17,106,000.

This demand also included a provision for Maureen to stay in her current residence, which was an asset of the estate. On May 1, 2017, Peggy made a proposal to settle for $16.25 million, with a provision that Maureen vacate her current residence. Defendants did not authorize plaintiffs to take any further action. On May 10, 2017, Peggy's attorney withdrew all offers. Plaintiffs then recommended making a demand of $16.75 million with a provision that Maureen could purchase her current residence for $350,000. Then, on May 25, 2017, defendants terminated plaintiffs. Defendants had retained new counsel and settled the case for $16.85 million on July 21, 2017. Defendants paid successor counsel a flat fee of $500,000.

¶ 20    Rushe testified that she did administrative work for Schlegel on this case. She had a bachelor's degree from the University College Dublin where she studied business and law. Schlegel testified that Rushe was a "clerical assistant" who performed "some analytical" and "organizational tasks," which included preparing and organizing documents received in discovery. Rushe had no formal training as a paralegal. She considered herself a volunteer because she was not issued a paycheck for the time she spent working for Schlegel. However, Schlegel had sponsored Rushe for numerous handball tournaments, which meant that he covered the entrance fee and costs associated with attending the tournaments. Rushe agreed that each of her 173 time entries was for seven hours. She testified that she worked at least seven hours on each of those days and sometimes longer.

¶ 21    Both parties presented expert witnesses. Plaintiffs presented John Brooks, a licensed attorney since 1989. Brooks had practiced for most of his career in trusts and estates. He had conducted many lectures and seminars on contested trusts and estates, was the general editor of a periodical and handbook on trusts and estates, and had received numerous awards as a lawyer.

¶ 22    Brooks's ultimate opinion was that a reasonable fee could be calculated by reference to the underlying contingent fee agreement. He described the case as "very complex" because the assets at issue involved "80 properties" and "a number of LLPs and LLCs in Illinois, Indiana, and Michigan." The O'Briens were also a litigious family. Success in the case would be "very difficult" because defendants did not have much leverage over the estates, trusts, and properties involved. Defendants desired cash, but Peggy and Richard, who had control over the assets, had no obligation to liquidate the assets. There was ultimately "no guarantee of any outcome" for defendants. Neither defendant had funds to hire an attorney, and they owed money to prior attorneys.

¶ 23    Brooks testified that both Levenfeld and Schlegel were highly qualified attorneys, they spent around 3000 hours over 19 months on the case, and ultimately achieved a "very good result." Brooks also referenced the demand plaintiffs proposed defendants make, which was "almost identical" to what defendants settled for less than 60 days after discharging plaintiffs. Brooks testified that the percentage agreed to was reasonable based on the circumstances. He based his testimony regarding a reasonable fee on the *quantum meruit* factors from case law and Rule 1.5, along with his personal experience. The number he reached as a reasonable fee was $2,132,390.60, which represented the contingency fee provision applied to the final offer plaintiffs procured on behalf of defendants of $16.25 million.

¶ 24    Defendants presented attorney David Feinberg, who practiced in the area of trusts and estates for about 14 years. Feinberg ultimately concluded that plaintiffs were not entitled to any relief under *quantum meruit* because they mishandled the case. To support his conclusion, Feinberg discussed plaintiffs' alleged (1) unclean hands, (2) undue influence, (3) Rule 1.5(e) violation, (4) lack of a negotiation strategy, and (5) lack of a litigation strategy. Feinberg testified

that it was unreasonable to use a contingency fee structure in a case where defendants' inheritance was uncontested. The contingency fee structure was also inappropriate based on the size of the uncontested interests, estimated to be in the tens of millions of dollars. Feinberg testified that there were other ways to structure the fee agreement without using a contingency provision, such as payment of an hourly rate at a later date and with interest or late fees. Feinberg had never seen a contingency provision in a case where the client had an uncontested percentage interest in an estate.

¶ 25    Feinberg also testified regarding Maureen's initial role as co-executor of Mary's estate. Feinberg explained that representing Maureen as both co-executor and beneficiary posed a potential conflict of interest. Feinberg thought it was a mistake to advise Maureen to resign as a co-executor because she lost several benefits, including leverage and visibility in the court process, access to the estate's records, and the right to recover legal fees related to her actions as co-executor. Feinberg also testified about what he considered litigation failures. Specifically, he noted that plaintiffs missed filing deadlines, requested continuances and failed to advance the case, and put defendants in an unfavorable bargaining position by failing to obtain independent valuations of the estate assets.

¶ 26    Both defendants also testified. Dan testified that he understood that both Levenfeld and Schlegel would be representing both defendants and that Levenfeld and Schlegel were attorneys in different firms. Dan was not particularly concerned about how the attorneys would split the fee. Dan explained that his financial situation was "pretty bad" when he hired plaintiffs. Dan had not had a "formal job" since 2014 and had resorted to selling items on eBay during plaintiffs' representation. Dan testified that it was "very disheartening" when Peggy withdrew all settlement offers. In Dan's view, that was the "last straw" as far as continuing with plaintiffs' representation.

¶ 27    Maureen similarly testified that she understood that Levenfeld and Schlegel would be representing both defendants and would be responsible for the legal matters in the case. Maureen "assumed" that Levenfeld and Schlegel would split the fee at the end of the case and thought how they split the fee was insignificant. Maureen agreed that the case was likely to "involve a significant amount of time." She testified that in the months leading up to the agreement with plaintiffs, her finances were "dwindling." She and Dan were "cut off financially" by Peggy and were receiving no income from the estate or other businesses. Neither Maureen nor Dan was able to pay a retainer or any money up front. Maureen testified that she was "devastated" when Peggy withdrew all settlement offers. Maureen felt that plaintiffs were not getting anything accomplished. She would not authorize any new demands because she had "lost faith" in plaintiffs.

¶ 28    On November 19, 2021, the trial court found that defendants benefited from plaintiffs' legal services and rejected many of defendants' arguments about plaintiffs' alleged errors during the representation. The court found that it was appropriate to have Maureen resign as co-executor because she was receiving no benefit through the position and her resignation allowed her to assert claims against the estate. The court found the move was "based on considered legal strategy and not on an improper motive." The court also rejected defendants' argument that the Rule 1.5(e) violation should bar recovery because the evidence did not show that prejudice resulted to either defendants or the administration of justice. The trial court noted that defendants knew both Levenfeld and Schlegel substantively represented them, each defendant communicated with each plaintiff about the representation, and defendants expressly testified that they knew each plaintiff would be compensated and did not particularly care how the fees would be shared.

¶ 29    The trial court ruled that plaintiffs were entitled to an award in *quantum meruit* for $1,692,390.60. The court calculated the award by using the parties' contingency fee agreement: $1.5 million (15% of the first $10 million) plus $685,000 (10% of $6.85 million) plus $7390.60 (expenses) minus $500,000 (amount paid to subsequent attorneys). In reaching this award, the court analyzed each of the seven factors courts consider in awarding *quantum meruit* fees, considered defendants' own views as to what was fair and reasonable at the outset of the engagement, and found that the amount of the contingency fee was a reasonable fee. The court likened this case to those where the discharged attorneys handled the case from inception to termination and expended significant resources in representing their clients over months and years, and where the posttermination acceptance terms did not change significantly from the terms of the pretermination settlement offer.

¶ 30    Defendants timely appealed.

¶ 31                            II. ANALYSIS

¶ 32    Defendants argue that the trial court erred (1) as a matter of law by basing plaintiff's *quantum meruit* award on the contingency fee specified in a contract that was illegal and unenforceable because it violated Rule 1.5(e); (2) by finding that plaintiffs' services conferred a benefit on defendants; and (3) by finding that the reasonable value of plaintiffs' services was $1,692,390.60 because plaintiffs failed to prove the reasonable value of their services where nearly half the number of billable hours was billed by a volunteer helper.

¶ 33                     A. Basis of *Quantum Meruit* Award

¶ 34    The first issue is whether a trial court can award a reasonable fee via a *quantum meruit* claim with reference to a contingency fee agreement that violated Illinois Rules of Professional

Conduct of 2010 Rule 1.5(e) (eff. Jan. 1, 2010) by failing to state how the two law firms would split the contingency fee. Whether a particular remedy is precluded as a matter of law is an issue we review *de novo*. See *Edward Atkins, M.D., S.C. v. Robbins, Salomon & Patt, Ltd.*, 2018 IL App (1st) 161961, ¶ 57.

¶ 35     Plaintiffs sought attorney fees through a claim of *quantum meruit*, which "is an equitable remedy [citation], which allows the circuit court to use its broad discretion in arriving at what it determines to be the reasonable value of the discharged attorney's services." *Seiden Law Group, P.C. v. Segal*, 2021 IL App (1st) 200877, ¶ 29. *Quantum meruit*, which means "as much as he deserves," is a term "used to describe the extent of liability on a 'quasi-contract,' *i.e.*, a contract implied in law." (Internal quotation marks omitted.) *Schroeder v. Sullivan*, 2018 IL App (1st) 163210, ¶ 46. "A quasi-contract, or contract implied in law, is one where there is no actual agreement between the parties, but nonetheless a duty is imposed to prevent injustice." *Id.* "As such, claims sounding in *quantum meruit* are predicated upon the reasonable value of the services performed." *Id.* In determining an appropriate fee for the reasonable value of the services performed, a court considers

> "the time and labor required, the attorney's skill and standing, the nature of the cause, the novelty and difficulty of the subject matter, the attorney's degree of responsibility in managing the case, the usual and customary charge for that type of work in the community, and the benefits resulting to the client." *Wegner v. Arnold*, 305 Ill. App. 3d 689, 693 (1999).

¶ 36     Rule 1.5 governs the fees attorneys can collect and controls the situation in this case because Schlegel and Levenfeld, lawyers in different firms, sought to divide the contingency fee. Rule 1.5(e) provides:

"(e) A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer, or if the primary service performed by one lawyer is the referral of the client to another lawyer and each lawyer assumes joint financial responsibility for the representation;

(2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and

(3) the total fee is reasonable." Ill. R. Prof'l Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010).

¶ 37    Plaintiffs concede that their contingent fee agreement with defendants violated Rule 1.5(e) because it did not specify the share of the fee each lawyer would receive. Plaintiffs nevertheless argue that the trial court did not err in ordering a recovery consistent with the contingency provision in the parties' agreement because the parties agreed to the contingency rate and plaintiffs' omission in the agreement about splitting the fee was not prejudicial to defendants or the administration of justice and was not egregious.

¶ 38    Rule 1.5 "embod[ies] this state's public policy of placing the rights of clients above and beyond any lawyer's remedies in seeking to enforce fee-sharing arrangements." *Romanek v. Connelly*, 324 Ill. App. 3d 393, 399 (2001). An attorney's violation of Rule 1.5 renders a fee agreement unenforceable. *Donald W. Fohrman & Associates, Ltd. v. Marc D. Alberts, P.C.*, 2014 IL App (1st) 123351, ¶¶ 33, 56. Strict compliance with Rule 1.5 is mandatory for any claim seeking fees under a fee-sharing agreement. See *id.* ¶ 41. However, violations of the Illinois Rules of

Professional Conduct, standing alone, do not preclude an award of fees on a *quantum meruit* basis. "Whether *quantum meruit* recovery is barred should depend on the egregiousness of the particular conduct involved." *Much Shelist Freed Denenberg & Ament, P.C. v. Lison*, 297 Ill. App. 3d 375, 381 (1998). Our supreme court has similarly declined to impose an absolute bar on recovery even where an attorney breaches a fiduciary duty to a client. See *In re Marriage of Pagano*, 154 Ill. 2d 174, 190 (1992).

¶ 39     Defendants do not argue that the rule violation in this case was so egregious as to preclude the award of a reasonable fee via *quantum meruit*. Instead, defendants argue that the trial court erred when it stated that it was awarding plaintiffs' fee on a *quantum meruit* basis but also based that award on the parties' contingency fee provision, which was unenforceable due to plaintiffs' violation of Rule 1.5(e). Defendants argue that by awarding attorney fees by reference to the contingency fee provision, "the circuit court effectively enforced an unlawful agreement that all parties agreed violated the Illinois Rules of Professional Conduct." Defendants continue that the court's reasoning, labeling the error as "technical" and nonprejudicial, is "directly contrary to well-established Illinois law and public policy."

¶ 40     Defendants cite *Fohrman*, 2014 IL App (1st) 123351, ¶ 56, for the proposition that a fee agreement that violates Rule 1.5 is against public policy and may not be enforced. There, Fohrman, an attorney, would refer cases to Alberts, another attorney. *Id.* ¶ 3. The attorneys had an oral agreement on how the fees would be shared. *Id.* However, the corresponding agreements between Alberts and the respective clients did not disclose how the fees would be shared. *Id.* ¶ 36. When Fohrman attempted to enforce the oral agreement against Alberts, the circuit court granted Alberts's motion to dismiss. *Id.* ¶ 1. On appeal, this court affirmed, holding that "Rule 1.5(e)

requires strict compliance and, in the absence of strict compliance with Rule 1.5(e)," Fohrman could not recover under the oral agreement for referral fees. *Id.* ¶ 44.

¶ 41    Recognizing that no post-*Fohrman* opinion of this court has addressed plaintiffs' contention that an attorney's recovery in *quantum meruit* can be based on a contingency fee specified in an unlawful fee agreement, defendants cite a California case, *Chambers v. Kay*, 56 P.3d 645 (Cal. 2002), which has rejected plaintiffs' contention. In *Chambers*, attorney Kay brought in attorney Chambers, who was an attorney in a separate law firm, to assist in a sexual harassment case. *Id.* at 647. After working on the case for a period, Kay relieved Chambers of his duties. *Id.* at 648. The attorneys independently agreed to a fee division in the case, and the client was informed of the agreed-to fee division; however, the attorneys never sought or obtained the client's written consent to the fee division. *Id.* When the case was ultimately tried to verdict, Kay received his attorney fees and refused to pay Chambers the fees set forth in their fee division agreement. *Id.* Instead, Kay offered to pay Chambers for his work on an hourly basis. *Id.* Chambers sued Kay for breach of contract or, in the alternative, recovery in *quantum meruit*. *Id.* On appeal to the California Supreme Court, Chambers argued that the fee-splitting rule violation did not render the attorney fee agreement unenforceable or, in the alternative, the court was free, despite the unenforceable agreement, "to award the entire fee provided for in the fee-sharing agreement as a proper *quantum meruit* determination." *Id.* at 658.

¶ 42    The California Supreme Court concluded that the agreement was unenforceable based on a violation of an ethics rule substantially like Rule 1.5(e) because the client did not consent in writing to the fee division and the court would not aid counsel in violating that rule, which helped ensure that clients were not charged unwarranted fees and promoted respect and confidence in the legal profession. *Id.* at 655. On the *quantum meruit* claim, the court rejected Chambers's attempt

to collect fees in line with the attorneys' agreement. *Id.* at 658. The court rejected Chambers's contention that, despite "the absence of the required written client consent, he should be allowed to accomplish indirectly a division of fees[, *i.e.*, the enforcement of an unlawful contract,] under the guise of a *quantum meruit* claim." *Id.* The court concluded that it could "perceive no legal or policy justification for finding that the fee the parties negotiated without the client's consent furnishes a proper basis for a *quantum meruit* award in this case." *Id.* The court noted that Chambers "could have protected his interests, and at the same time fulfilled the beneficial purposes of the rule and acted in [the client's] best interests" by complying with the rule. *Id.* at 659.

¶ 43    Plaintiffs attempt to distinguish *Chambers* by arguing that its holding is limited to situations involving lawyers attempting to recover from one another based on the terms of fee-splitting agreements that were not disclosed to clients in violation of Rule 1.5(e). According to plaintiffs, neither *Chambers* nor Illinois law stand for the proposition that the lawyers' failures to disclose their fee-splitting agreements precludes them from recovering reasonable fees from the clients based on or with reference to the underlying fee-splitting agreements. Plaintiffs' argument lacks merit. The purpose of Rule 1.5(e) is to protect the client, so it certainly applies to situations where an attorney seeks to recover fees against a client on the basis of *quantum meruit* just as it applies to disputes between attorneys trying to enforce their undisclosed fee-splitting agreements.

¶ 44    We find the analysis in *Chambers* consistent with Illinois law, which is clear that strict compliance with Rule 1.5 is mandatory (see *Fohrman*, 2014 IL App (1st) 123351, ¶ 44). Allowing an attorney to skirt the rule's requirements and indirectly enforce an unlawful fee agreement through *quantum meruit* recovery would lead to an unjust and absurd result and render the rule superfluous. See *Ferris, Thompson, & Zweig, Ltd. v. Esposito*, 2016 IL App (2d) 151148, ¶¶ 9, 41. Nevertheless, plaintiffs argue that Illinois courts have routinely awarded as *quantum meruit*

damages the entire contingent fee to a lawyer who did most of the work in a case but was discharged shortly before a settlement was reached. To support this proposition, plaintiffs cite *Rhoades v. Norfolk & Western Ry. Co.*, 78 Ill. 2d 217, 230 (1979), which cites *Fracasse v. Brent*, 494 P.2d 9, 14 (Cal. 1972), for the proposition that "in cases in which an attorney who has done much work is fired immediately before a settlement is reached, the factors involved in determining a reasonable fee would justify a finding that the entire contract fee is the reasonable value of services rendered." Accord *DeLapaz v. Selectbuild Construction, Inc.*, 394 Ill. App. 3d 969, 973-74 (2009); *Wegner*, 305 Ill. App. 3d at 693; *Whalen v. Shear*, 190 Ill. App. 3d 84, 87 (1989); *Dobbs v. DePuy Orthopaedics, Inc.*, 885 F.3d 455, 459 (7th Cir. 2018). Plaintiffs' reliance on these cases is misplaced because they involved situations where the clients fired counsel *and* the underlying contingency fee agreements were not voidable based on a violation of the Rules of Professional Conduct. Here, in contrast, the contingency fee agreement was unenforceable *ab initio* because it violated Rule 1.5(e).

¶ 45    Based on the foregoing discussion, we conclude that the trial court erred by awarding plaintiffs as a *quantum meruit* award an amount equal to a negotiated contingency fee in a contract that violates Rule 1.5(e).

¶ 46                                B. Benefit of Services

¶ 47    Next, we address whether plaintiffs' services provided a benefit to defendants.

¶ 48    "To recover under a *quantum meruit* theory, a plaintiff must prove that (1) it performed a service to benefit the defendant, (2) it did not perform the service gratuitously, (3) defendant accepted the service, and (4) no contract existed to prescribe payment for the service." *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 31. We will uphold a trial

court's finding that a plaintiff has met its burden unless that decision is against the manifest weight of the evidence. *Rohter v. Passarella*, 246 Ill. App. 3d 860, 865 (1993). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 49    Defendants only challenge the first element, arguing that plaintiffs' services provided no benefit to defendants. The trial court found that both plaintiffs' efforts and results benefitted defendants. The trial court found that plaintiffs "reviewed thousands of documents, formulated a litigation strategy, and engaged in multiple lawsuits on [d]efendants' behalf, including in state and federal court cases." Those litigation efforts in turn put pressure on Peggy to ultimately settle the case for $16.85 million. The trial court noted that defendants were receiving "no benefit whatsoever" from their combined 50% interest in the estate when they hired plaintiffs. Over the next 19 months, plaintiffs obtained progressively larger settlement offers culminating in a $16.25 million offer three weeks before defendants fired plaintiffs. Less than two months later, defendants settled for $16.85 million, a number "clearly based in significant part" on plaintiffs' efforts.

¶ 50    Defendants cite *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961 (2010), arguing that plaintiffs failed to present evidence to show that their work was valuable to defendants. In *Bernstein*, the trial court awarded a departed attorney 10% of all fees earned in open cases that a successor firm had inherited. *Id.* at 962. However, the attorney presented no evidence on the amount of time he worked on the cases at issue. *Id.* at 980. The attorney only testified to "extremely generalized statements" regarding the work he performed on the cases. *Id.* The attorney did not identify his hourly rate. *Id.* This court concluded that, while the attorney "may not have been required to provide a line-by-line detailing of all his efforts, he did need to, at the very least,

introduce some evidence specific enough to prove the reasonable value of the benefit [the successor firm] allegedly received." *Id.* at 979.

¶ 51     We find *Bernstein* distinguishable from this case. Here, plaintiffs did file a detailed accounting of their time spent representing defendants. Plaintiffs also detailed their litigation strategy and how that strategy played out over the course of 19 months. Plaintiffs also presented evidence on how the negotiations progressed to Peggy presenting an offer of $16.25 million, a significant upgrade from defendants' initial position of receiving zero benefit from their combined 50% ownership in the O'Brien estate. Defendants' final settlement of $16.85 million was substantially like the offer that plaintiffs recommended defendants make immediately prior to their termination. In short, plaintiffs submitted enough specific evidence to establish that their efforts benefitted defendants in that, immediately after plaintiffs' termination, and without any apparent intervening circumstances, defendants were able to settle their claims with the estate. The trial court's finding in that regard was neither unreasonable nor arbitrary, and we are not convinced that the opposite conclusion is clearly evident. Thus, plaintiffs were entitled to an award of attorney fees in *quantum meruit*.

¶ 52     Accordingly, we reverse the trial court's decision that awarded plaintiffs $1,692,390.60 in attorney fees and remand this matter to the trial court to calculate the award consistent with the relevant factors courts consider in rendering a *quantum meruit* award. We remand the matter to the trial court for a determination of an appropriate fee based on the reasonable value of plaintiffs' services.

¶ 53                              C. Reasonable Value of Services

¶ 54    Finally, defendants argue that the trial court erred by finding that the reasonable value of plaintiffs' services was $1,692,390.60 because plaintiffs failed to prove the reasonable value of their services where nearly half the number of billable hours was billed by a volunteer helper. We do not reach the merits of this issue based on our decision above to remand this matter to the trial court to render a *quantum meruit* award based on the relevant factors involved in determining the reasonable value of plaintiffs' services rendered.

¶ 55                              III. CONCLUSION

¶ 56    For the foregoing reasons, we reverse the trial court's decision that rendered a *quantum meruit* award based on the terms of the underlying unenforceable contingency fee agreement and affirm the trial court's determination that plaintiffs' services provided a benefit to defendants. We remand this matter to the trial court to render a *quantum meruit* award based on the relevant factors involved in determining the reasonable value of the services rendered.

¶ 57    Affirmed in part and reversed in part.

¶ 58    Cause remanded.

*Andrew W. Levenfeld & Associates, Ltd. v. O'Brien*, **2023 IL App (1st) 211638**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-15055; the Hon. Cecilia A. Horan, Judge, presiding. |
| **Attorneys for Appellant:** | John M. Fitzgerald, Amanda N. Catalano, and Nicole R. Marcotte, of Tabet DiVito & Rothstein LLC, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Jeremy N. Boeder, of Tribler Orpett & Meyer, P.C., of Chicago, for appellees. |