MIDWEST ENVIRONMENTAL CONSULTING AND REMEDIATION SERVICES, INC., Plaintiff-Appellee, v. PEOPLES BANK OF BLOOMINGTON, as Trustee, Defendant-Appellant (First National Bank of Springfield *et al.*, Defendants).

Fourth District   No. 4—93—0089

Argued July 20, 1993.—Opinion filed September 9, 1993.

Mercer Turner (argued) and Debra Sudduth, both of Law Office of Mercer Turner, P.C., of Bloomington, for appellant.

William R. Kohlhase (argued) and Thomas R. Davis, both of Miller, Hall & Triggs, of Peoria, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendant Peoples Bank of Bloomington, as trustee under trust No. PBB—140, appeals from an order of the circuit court of McLean County awarding judgment in favor of plaintiff, Midwest Environmental Consulting & Remediation Services, Inc. (Midwest Environmental), in the total amount of $40,923.44, consisting of $37,719.86 for foreclosure of a mechanic's lien, $3,125.58 interest, and $78 costs. The order was entered following a bench trial. The beneficial interest in the trust belongs to Snyder Development, Inc. (Snyder Development), which was a party to the contract involved in this case. Additional defendants, the First National Bank of Springfield and Mid-State Petroleum, Inc., were dismissed prior to trial.

Plaintiff's complaint sought to foreclose a mechanic's lien. The subject property is lot 2 in B & E Subdivision to the City of Bloomington, according to the plat thereof recorded July 15, 1987, as document No. 87—14112 in McLean County, Illinois, and commonly known as 1702 East Empire Street, Bloomington, Illinois. The basis of the mechanic's lien was the performance by plaintiff of an oral contract for the engineering consultation fees and expenses for the removal of underground storage tanks and the excavation of contaminated soil from the subject property on which a gasoline service station had been lo-

cated. In its answer to the complaint, defendant alleged an "affirmative defense" for a setoff "for cleanup expenses incurred by Defendant which were caused by Plaintiff's negligently rendered services and advice."

The issues to be considered in this appeal are whether (1) negligence is an affirmative defense to an action to foreclose a mechanic's lien; (2) defendant received the full benefit under its contract with plaintiff; (3) plaintiff was not entitled to assert a mechanic's lien because he held himself out as an engineer, but was not licensed in Illinois; (4) charges for disposing of contaminated soil at a landfill were lienable charges; and (5) the judgment was against the manifest weight of the evidence. Judgment is affirmed as modified herein.

Before proceeding to an analysis of the issues, this court must address a request made by defendant in the appellant's brief to supplement the record with defendant's three-page trial memorandum which, although provided to plaintiff's counsel and the trial court, was not included in the record on appeal. Although the request ought properly have been made by motion with supporting affidavit (134 Ill. 2d Rules 329, 361(a)), plaintiff does not object to the request. The request to supplement the record is allowed.

The first issue is whether negligence is an affirmative defense to an action to foreclose a mechanic's lien. Defendant's affirmative defense not only alleges that the plaintiff's performance of the site cleanup was negligent, but as the evidence indicates defendant also complains that the service rendered by plaintiff in *estimating* the cost of the cleanup was rendered negligently. The allegation in the affirmative defense could arguably be based on the theory of negligent misrepresentation. However, that is not the theory asserted by defendant in the trial court or on appeal.

Plaintiff sought to foreclose a mechanic's lien pursuant to section 1 of the Mechanics Lien Act (Act) (Ill. Rev. Stat. 1991, ch. 82, par. 1). The rationale behind the Act is that when the owner of property has benefitted from the work of a contractor, it is just to require the owner to pay for such benefit if the owner's actions induced or encouraged the contractor to perform the work. (*Verplank Concrete & Supply, Inc. v. Marsh* (1976), 40 Ill. App. 3d 742, 744, 353 N.E.2d 27, 29.) Mechanic's liens are purely statutory, in derogation of the common law, and must be strictly construed. (*Hoier v. Kaplan* (1924), 313 Ill. 448, 451, 145 N.E. 243, 244.) A remedy under the Act is in addition to ordinary common law remedies for the enforcement of the contract out of which the lien arises. *Hoier*, 313 Ill. at 455-56, 145 N.E. at 246; *West v. Flemming* (1857), 18 Ill. 248, 248.

■ There is authority for the proposition that a defense based on an architect's negligent performance may be asserted against an architect who is suing to recover compensation for a job. (6 C.J.S. *Architects* §41, at 508 (1975).) Therefore, under section 2—613(d) of the Illinois Code of Civil Procedure (Code) (Ill. Rev. Stat. 1991, ch. 110, par. 2—613(d)), negligent performance may be raised as an affirmative defense in an action by an engineer to recover compensation sought to be enforced by a mechanic's lien.

■ The next issue is whether plaintiff was precluded from asserting a mechanic's lien because Allan Green, the company's president, held himself out as an engineer, but was not licensed in Illinois. The persons entitled to a mechanic's lien are defined in section 1 of the Act. That statute states in part:

> "Any person who shall by any contract or contracts, express or implied, or partly expressed or implied, with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve the lot or tract of land or to manage a structure thereon *** or perform any services or incur any expense as an architect, structural engineer, professional engineer, land surveyor or property manager in, for or on a lot or tract of land for any such purpose; *** is known under this Act as a contractor, and has a lien upon the whole of such lot or tract of land and upon adjoining or adjacent lots or tracts of land of such owner constituting the same premises and occupied or used in connection with such lot or tract of land as a place of residence or business; *** and interest at the rate of 10% per annum from the date the same is due. *** This lien attaches as of the date of the contract." Ill. Rev. Stat. 1991, ch. 82, par. 1.

Contrary to defendant's position, plaintiff need not be an architect, structural engineer, professional engineer, land surveyor, or property manager to assert a mechanic's lien. Any person who does improvement work on the land under a contract with the owner can assert a mechanic's lien.

In *Mani Electrical Contractors v. Kioutas* (1993), 243 Ill. App. 3d 662, 664-67, 611 N.E.2d 1167, 1169-70, the enforcement of a mechanic's lien was considered where it was claimed that the contractor proceeded in violation of the Chicago Municipal Code. The Chicago Municipal Code provided that (1) it was unlawful for a person to engage in the business of electrical contracting without being registered as such, (2) no person could operate under a permit issued to another person, and (3) it was unlawful for a registered contractor to furnish

a permit for electrical work to a person not entitled to such a permit under that Code. (See Chicago Municipal Code §§86—16, 86—37, 86—38 (1984).) In analyzing the contract on which the lien was based, the court stated: "The question to be asked is whether the bargain necessarily contemplated an illegal bargain, not whether an otherwise legal contract is performed in a manner which involves a violation of the law." (*Mani Electrical Contractors*, 243 Ill. App. 3d at 667, 611 N.E.2d at 1170.) The contract was held to be enforceable.

Just as in the *Mani Electrical Contractors* case, in this case the contract was not illegal. Nor has defendant proved that, in order to do the job, Green must have been a licensed professional engineer. When defendant began dealing with Green, he was an employee of another engineering firm, Lewis, Yockey, and Brown (LYB). It was at this time that Green made the original estimates. Defendant does not complain that LYB was not licensed in Illinois. Nor has defendant presented any evidence suggesting that only an engineer can enter into a contract to remove contaminated soil from the site of a former gasoline service station.

Defendant cites statutes which make it a criminal offense to practice engineering in Illinois without being properly licensed. Section 4(o) of the Professional Engineering Practice Act of 1989 does define a professional engineering practice and includes subsurface investigations as an example of professional engineering. (Ill. Rev. Stat. 1991, ch. 111, par. 5204(o).) This act was in effect at all times pertinent to this case. However, Green testified that his firm was not required to be so licensed to perform this work and that there was a licensed professional engineer in his firm.

It is a defense to an action brought by an architect to recover compensation that the architect was not licensed. (6 C.J.S. *Architects* §41, at 508 (1975).) A recent Illinois case has recognized a cause of action to recover fees paid to an unlicensed architect. (*Ransburg v. Haase* (1992), 224 Ill. App. 3d 681, 684-88, 586 N.E.2d 1295, 1297-1300.) In this case, the trial court's order did not specifically address this issue, and this court also need not address it on the merits. Defendant did not carry the burden of pleading and proving his defense. Defendant never pleaded this affirmative defense. Nor did defendant move to amend the answer to conform to the proof, although this evidence was admitted essentially without objection. Therefore, this issue was not properly framed for the trial court by the pleadings. Ill. Rev. Stat. 1991, ch. 110, par. 2—613(d).

The next issue is whether charges for disposing of contaminated soil at a landfill were lienable charges. Defendant argues that

the landfill costs are separable from expenses incurred as a result of activities on the premises. Defendant concedes that in *Cleveland Wrecking Co. v. Central National Bank* (1991), 216 Ill. App. 3d 279, 287, 576 N.E.2d 1055, 1061, the court decided that the hauling away of debris is a lienable activity. Defendant cites no legal authority which states that the charges by the landfill to the contractor for accepting debris, and particularly contaminated soil, are not lienable. In addition, the defendant's argument in the trial court was to the effect that demolition and hauling away debris were not lienable charges under the Act. In the trial court, defendant cited *Robinette v. Servite Fathers* (1977), 49 Ill. App. 3d 585, 364 N.E.2d 679. Noting the Act had been amended and citing *Cleveland Wrecking*, the trial court rejected the argument. Now, on appeal, defendant argues that the disposal charge is separable from the demolition and hauling charges. This argument was never made in the trial court. Issues not raised and theories not relied on in the trial court cannot be raised for the first time on appeal and are waived. *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d 417, 420.

Even if the issue had not been waived, the disposal of the removed contaminated soil is an integral part of the overall plan to improve the land and is lienable under the Act. (See *Cleveland Wrecking*, 216 Ill. App. 3d at 287, 576 N.E.2d at 1061.) The activity of removing the soil is not separable from disposing of it. Once removed, it must be disposed of in some fashion. If there is a cost which is incurred as a result, that cost is part of the removal of the soil.

Finally, we consider the interrelated issues of whether defendant received the full benefit of its contract with plaintiff and whether the judgment was against the manifest weight of the evidence. The claim of mechanic's lien (prepared April 10, 1992) was filed with the complaint and indicated that the amount of services and expenses was $37,719.86. Green testified he was the president and senior environmental engineer of Midwest Environmental Consulting & Remediation Services in Tremont, Illinois. Prior to that he was an environmental engineer and project manager with LYB. He had been involved in over 150 cleanups of underground storage tanks.

Green first became aware of the subject property in October 1991, when he was an employee of LYB. He did the engineering work on the subsurface investigation. A release from the tanks was identified and contamination levels were above the cleanup criteria set by the Illinois Environmental Protection Agency (IEPA). The report was sent to Tom Arndt, a representative of Snyder, who was informed that the

owner of the property had an obligation to report the release to the IEPA and to initiate a site remediation plan.

Green testified that during the time he was an employee with LYB, in his communications with Arndt:

"I told him that if the contamination was directly limited to the tank backfill and a couple of feet of the native material around as the borings would have indicated that his engineering, and the only time it was given was with Lewis, Yockey and Brown, who was not a contractor, that his engineering and analytical costs would not exceed $10,000 to the best of my knowledge, but I would not give him a firm estimate."

Green left LYB on November 16, 1991. Subsequently, the job was transferred to plaintiff for site remediation. In the last week of November, Arndt telephoned Green and inquired if the firm would provide engineering services with regard to site cleanup. Green agreed to take the project. His firm was not yet incorporated at that time. There was no written contract.

The work was done according to IEPA specifications. All obviously contaminated soil, exhibiting odors or staining, was removed first. These soils were hauled to the Livingston County Landfill, a licensed disposal facility. As the excavation proceeded, samples were taken from sidewalls and floor and were tested. Once the level of contaminants' was found to be below cleanup criteria, that area of the excavation ceased.

The excavation work continued for about three weeks. Green sent a letter to Arndt dated January 2, 1992, advising of the status of the cleanup. After receiving the analysis of the samples from the lab, Green prepared a report.

During the cleanup, Green had a discussion with Arndt to offer cost-effective alternatives to clean up the contaminated, sand-filled area. Arndt informed Green that due to the pending sale of the property, the time could not be spent to pursue alternative remedial technologies. Plaintiff obtained preferred rates from the landfill and had already established a line of credit. As a result, the landfill charges went through plaintiff in connection with the cleanup of this site. All excavated soil was deposited at the Livingston County Landfill. The invoices sent by plaintiff to Snyder Development for the cleanup included the bills for the landfill and laboratory expenses, and the consulting fees were fair and reasonable charges for that kind of work in this area. The four invoices plaintiff sent defendant totalled $37,992.86. The difference between this amount and the amount as-

serted in the lien arises because of a $273 bill dated May 12, 1992, post-dating the lien.

After plaintiff was hired to do the cleanup, Green advised Arndt about what would happen with the IEPA, the nature of the process, and the landowner's obligation with regard to site cleanup and the available options. The options were reviewed before the project started. He told Arndt about the more cost-effective alternatives available over landfilling. It was Green's practice to inform clients of those alternatives, and he recalled doing that in this case. At that time, the IEPA prohibited the "land farming" of the material on a real farm and required that the material be disposed of in a licensed disposal facility. Green did not discuss with Arndt land farming on a farm, but did discuss land farming on the site itself. The method was not used because defendant could not tie up the property that long.

Green testified cleanup is a very costly matter. It can range from $4,000 to $500,000. He told Arndt that he did not give estimates on cleanup "because you cannot base, just upon borings ah, what kind of contamination you are going to deal with until you remove the tanks and begin to excavate. There are too many unknown factors involved." The engineer has no control over the contractor's fee.

Defendant's group exhibit No. 1 contained invoices paid regarding cleanup of this site. There were invoices from LYB for engineering, telephone and lab expenses totalling $2,892.78; from Mid-State Petroleum, an invoice for removal of contaminated soil, in the amount of $28,766.35; bills from Lenz Oil Service, Inc., for disposing of waste water removed from the hole and the storage tanks, totaling $4,403.42; a bill from Daily Analytic Laboratories for soil tests, which Arndt thought were for the tests on the initial borings, amounting to $1,130; and a $2,400 bill from the State of Illinois for registering the tanks. Arndt understood the tanks had to be registered before they could be removed. Except for the LYB bill, all were incurred after plaintiff advised Arndt about the cost of the cleanup. According to Arndt, Green did not say the cleanup could range from $4,000 to $500,000.

Defendant's contract with Mid-State Petroleum to do the excavation was entered into on November 2, 1991. On November 4, 1991, defendant applied for the permit to take out the tanks. Approval was received on November 15, 1991. This was all before there were any dealings with plaintiff's company. On November 22, 1991, Arndt wrote a letter to LYB informing that firm that plaintiff would be used for the cleanup (plaintiff's exhibit No. 26). Up to that time, defendant was still using LYB.

Arndt, at times, went to the site in response to calls from Green and was told what was happening and what kind of costs were being incurred. Arndt was aware as the cleanup was ongoing that there was more expense. At one point, he stopped the work when he found out that the costs were going "out of sight." He discussed it with Jack Snyder, and they decided to continue when they were given another price from Green. On the second day of the cleanup, they were given a second "estimate." Green told them that the costs were going to be in the $25,000 to $30,000 range. This conversation took place on the site, and Arndt told Green to hold up the work until he got approval. The costs that were increasing were the excavation and removal of the fill and the hauling to the landfill. Defendant had contracted with Mid-State on a unit basis for hauling. When told that the costs were increasing rapidly, they talked about alternatives, but Snyder Development rejected the alternatives, deciding to incur the increased costs and get the cleanup done. With regard to fax charges, mileage, *et cetera*, Arndt conceded that some engineering firms billed for disbursements and expenses. When firms billed for disbursements, it was Snyder Development's practice to pay.

Jack O. Snyder testified he was the president of Snyder Development. The company used firms with which it was familiar, negotiated a fee, and moved forward. The fee agreement was almost never reduced to writing. This included engineering firms. Green provided the cleanup estimate when he worked for LYB. When asked what his understanding was as to the cost of the cleanup project, Snyder stated, "We had had an estimate of $10,000."

Just as the cleanup got into full swing, Arndt called Snyder and said there was a problem. Arndt told Snyder the area they were excavating was about double what had been expected and that Green said the cost would be "25 to 30, to be on the safe side." Arndt told Snyder he had stopped the job. Snyder considered the situation for about one hour and then told Arndt that he did not think they had any choice because of the obligation to the purchaser of the property, who had already designed a building and was getting ready to build. Snyder told Arndt to finish the cleanup so the sale could be completed. The cleanup cost was more than $30,000. The final costs were about $77,000. Snyder Development received the "clean letter" from the IEPA in mid-April 1992.

Lyle Duane Yockey, the president of LYB, testified, referring to the report prepared by Green with regard to the subsurface investigation while Green was still working with LYB, that it was not possible to prepare a budget for cleanup costs based on that report. Three of

the four borings showed contamination. Although one could surmise there were no contaminants in one direction, the extent of the contamination in the other direction would not have been known. More information was needed for a budget projection. There was an extremely large potential for liability. There is potential for contamination leaving the site, contaminating ground water, sewer, or the public water supply, and migrating fumes entering other buildings. The party responsible for the cleanup would be responsible for those problems as well. It was his expert opinion that it was impossible to give a budgetary estimate of cleanup costs based on the information contained in the subsurface investigation report.

Green testified in rebuttal that, prior to plaintiff starting work on this project, Arndt was told that plaintiff billed on the basis of time and expense. With regard to the lamination charge in the invoice, Green testified the firm billed a one-time $25 charge instead of charging for copy covers for reports, *et cetera*. This charge included lamination and photographs for reports. There was an equipment rental charge for the rental of a photoionization detector for $100 per day for five days. That detector was used on site to determine contaminants. The mileage charge was for driving to the site and from the site to the lab. The film charge was for photographs taken on the site for the IEPA. With respect to all charges, there was a 15% charge for overhead and profit. The 15% charge for overhead and profit was included on plaintiff's exhibit Nos. 18 and 19 and the total amount on these two exhibits was $4,098.96. When asked what the basis for that was, Green testified: "The 15% is a standard figure accepted by the EPA in their reimbursement procedure 15% was an acceptable level by the EPA. That is the level we were using on that which covers the insurance and things like that for the bills that go through our office." In addition to the $80-per-hour consulting fee, there was a one-hour "administrative fee" for secretarial time typing reports. The laboratory charge included on one of the invoices was for samples taken for the IEPA closure on the site. Cellular phone charges were for expenses incurred telephoning to Arndt and to plaintiff's office, *et cetera*, regarding this site. The fax charge was for copies of the report faxed to the IEPA after Snyder failed to send the report to the IEPA. This was done to expedite the closure on the site.

"In a bench trial, it is the function of the trial judge to weigh the evidence and make findings of fact. (*Chicago Investment Corp. v. Dolins* (1985), 107 Ill. 2d 120, 124.) In cases where the evidence is close, such as the instant case, where findings of fact must be determined from the credibility of the witnesses, a

court of review will defer to the trial court's factual findings unless they are against the manifest weight of the evidence. (*Dolins*, 107 Ill. 2d at 123-24; *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 318-19.) The court on review must not substitute its judgment for that of the trier of fact. *Cosmopolitan National Bank*, 103 Ill. 2d at 314-15." *Kalata v. Anheuser-Busch Cos.* (1991), 144 Ill. 2d 425, 433-34, 581 N.E.2d 656, 660-61.

In this case, the trial court made specific findings. With respect to cost of the project, the trial court referred to the plaintiff's testimony that the "cost could run as low as $4,000 and as high as $500,000," that the $10,000 figure was a "guesstimate," that defendant had not had any prior excavation projects involving this type of cleanup, and that when the $25,000 to $30,000 figure was exceeded, defendant permitted the project to continue to completion. These findings are based upon the evidence presented. The trial court's findings were not against the manifest weight of the evidence.

Defendant argues that plaintiff's recovery must be limited to the terms of the oral contract and that the oral contract must have sufficiently definite and certain terms to be enforceable. (*Lankton-Ziegle-Terry & Associates, Inc. v. Griffin* (1987), 156 Ill. App. 3d 765, 766, 509 N.E.2d 785, 786.) Defendant further argues that the evidence does not support the finding that the oral contract between the parties allowed for the 15% markup. Defendant also contests the findings of the trial court with regard to the absence of negligence on the part of plaintiff.

■ The trial court in this case specifically found that this was a cost-plus contract. A cost-plus contract has been defined as follows:

"*Cost-plus* contract. A 'cost-plus-fixed-fee contract' is one under which one of the parties undertakes to pay all costs incurred by the other party in the performance of his contractual duties, plus a fixed fee over and above such reimbursable services. In a cost-plus contract, the performing party's profit is limited to the amount specified, and the paying party gets advantage of any excess profit earned. In a 'cost contract,' however, the paying party obtains the advantage of all profits." 17 C.J.S. *Contracts* §10, at 582 (1963).

See also *People ex rel. Kerner v. Keeney* (1948), 399 Ill. 611, 616, 78 N.E.2d 252, 254.

■ In the case at bar, the trial court's determination that the parties had an oral cost-plus contract is not against the manifest weight of the evidence. Arndt agreed to a fee of $80 per hour for

plaintiff. In addition, Arndt understood that all costs would be included in the charges. However, neither of the parties anticipated the final amount of the charges, which arose because of unforeseen difficulties. Defendant could not now be relying on the $10,000 estimate Green gave while he was working at LYB. Defendant agreed to continue the cleanup after being notified that the expenses would be substantially greater and after having received an estimate in the $25,000 to $30,000 range.

With regard to whether defendant received the full benefit of its contract with plaintiff, the only case cited by defendant is *Wells v. Minor* (1991), 219 Ill. App. 3d 32, 42, 578 N.E.2d 1337, 1344, which is quoted for the proposition that there is a "well-accepted general rule that damages for breach of contract should place the party in the position he would have been had the contract been performed." In *Wells*, this statement of law is discussed in the context of the component of damages relating to the cost of completion. Since defendant in this case did not allege that plaintiff failed to complete the removal of the contaminated soil pursuant to the oral contract, this argument by defendant has no merit. Defendant is merely complaining that the cost of performing the contract exceeded the estimate. Plaintiff is not being provided a windfall recovery in this case. Plaintiff fully performed all of the work for which compensation is sought.

▮ The inclusion of the 15% markup must be found as a result of Green's testimony to the effect that this is what the IEPA generally allows. However, such testimony is not sufficient to establish a custom and usage in the trade. Arndt testified he did not agree to such a charge.

In *Clark v. General Foods Corp.* (1980), 81 Ill. App. 3d 74, 78-79, 400 N.E.2d 1027, 1031, the court discussed custom and usage as follows:

"The second issue raised by General Foods is whether the evidence was sufficient to establish a custom and usage relating to the one-year term of the contract, such that the provision to that effect can be said to have been part of the contract between the parties. The rules with respect to this are well established. As long ago stated in *Kelly v. Carroll* (1921), 223 Ill. App. 309, 315-16:

'A usage or custom to be binding must be so uniform, long-established and generally acquiesced in and so well known as to induce the belief that the parties contracted with reference to it, nothing appearing in their contract to the contrary, and the existence of such a custom or usage cannot be

considered established when the proof consists of a few isolated instances. [Citation.]

*** When the custom of a particular trade, business or profession is involved, its existence cannot be regarded as having entered into the contracts of others not engaged in such trade, business or profession unless such persons have had actual knowledge of the custom or are shown to have been previously engaged in transactions where the custom has been recognized. The rule that a usage or custom affects contracts, generally rests upon the theory that the parties in making the contract had such custom in their minds and stipulated with reference to it, thereby making it a part of their contract. When existence of the custom has been proved, it has the force of law within the sphere where established and enters into the contracts of those within that sphere who have knowledge of its existence. A presumption of such knowledge may be shown by facts and circumstances.'

When a person or company deals in a market, it is presumed that they deal in accordance with general and uniform customs and usages prevalent in that market. (*Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co.* (1929), 334 Ill. 281, 165 N.E. 793; *Katz v. Brooks* (1965), 65 Ill. App. 2d 155, 212 N.E.2d 508; *Fifteenth Avenue Christian Church v. Moline Heating & Construction Co.* (1970), 131 Ill. App. 2d 766, 265 N.E.2d 405.) Whether a custom or usage is prevalent in a particular field of business is a question of fact for the fact-finder, to be determined from the evidence presented.''

In the case at bar, what the IEPA allows in its dealings does not establish a trade custom and usage, nor does the evidence establish defendant was familiar with or should have been familiar with the proposed custom so as to allow the inference that the defendant entered into the subject contract with the custom in mind.

Therefore, the judgment awarded in this case is modified by reducing the amount recoverable on the lien to $33,620.90 ($37,719.86 minus $4,098.96) and reducing the interest included in the judgment from $3,125.58 to $2,689.67. After including $78 costs, the total judgment is modified to $36,388.57.

■ Finally, in the absence of proof of damages on the part of defendant, plaintiff would be entitled to recover under the mechanic's lien even if Green's actions were negligent. In order to recover in tort against plaintiff for negligence, and indeed to have a defense for the

nonpayment under the contract so as to defeat the lien, defendant must have incurred damages as a result of the alleged negligence. The trial court's conclusion that the defendant has not proved any damages which resulted from the alleged negligence for the plaintiff is not against the manifest weight of the evidence. The evidence was that once the leak of contaminants was discovered, defendant had the obligation of cleaning it up. Therefore, regardless of the fact that Green underestimated the cost of the cleanup, defendant had no alternative but to clean up the site and to incur the costs therefor.

For the foregoing reasons, the judgment of the circuit court of McLean County is modified to award plaintiff a judgment against defendant in the total amount of $36,388.57, and as modified, the judgment is affirmed.

Affirmed as modified.

STEIGMANN, P.J., and LUND, J., concur.