2025 IL App (2d) 240342-U
No. 2-24-0342
Order filed January 14, 2025

NOTICE: This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PHOENIX & ASSOCIATES, INC., | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| Plaintiff-Appellee and Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21-CH-44 |
| | ) | |
| GILBERTS DEVELOPMENT, LLC, *et al.*, | ) | |
| | ) | Honorable |
| Defendant-Appellant and Cross- | ) | Divya K. Sarang, |
| Appellee. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

ORDER

¶ 1    *Held*: Evidence did not support *quantum meruit* award where plaintiff failed to introduce evidence as to value of benefit conferred on defendant; trial court properly denied plaintiff's mechanic's lien claim where plaintiff did not prove existence of valid contract between the parties.

¶ 2                          I. INTRODUCTION

¶ 3    Defendant, Gilberts Development, LLC, appeals the judgment of the circuit court of Kane County entering judgment in the amount of $113,092 in favor of plaintiff, Phoenix & Associates, Inc., on the fourth count of its complaint alleging a claim in *quantum meruit*. The trial court entered

judgment in favor of Gilberts Development on the other three counts (mechanic's lien, breach of contract, unjust enrichment). On appeal, Gilberts Development asserts that Phoenix failed to prove all of the elements of such a claim and that the claim is barred, in part, by the statute of limitations. Phoenix has also filed a cross-appeal in which it argues that the trial court erred in dismissing the first count of its complaint seeking to enforce a mechanic's lien. For the reasons that follow, we affirm in part and reverse in part.

¶ 4                                    II. BACKGROUND

¶ 5      The instant case arises out of a long-term relationship between the parties pursuant to which Phoenix provided certain professional and other services to Gilberts Development with respect to property owned by Gilberts Development in the Village of Gilberts known as The Conservancy. The Conservancy is a residential development. Phoenix began performing services for Gilberts Development in the fall of 2014 and continued to do so until, according to Phoenix, June 2020. In the course of their dealings, Gilberts Development paid Phoenix a total of $1,208,972.80. Phoenix alleged another $225,000 is due, as pleaded in its four-count complaint.

¶ 6      George Kanagin (George) is an employee of Phoenix who holds the title of Director of Land Use, Entitlement, and Compliance. George is certified by the Army Corps of Engineers as a Storm Water Pollution Prevention Program[1] (SWPPP) representative. Constance Kanagin (Constance) is the president of Phoenix. Evon Kanagin (Evon) performs administrative duties and is also a SWPPP representative. Troy Mertz is the manager of Gilberts Development. Brent Schroeder, who is not a party, is the owner of two companies that perform paving, snowplowing, and excavation (Schroeder Asphalt Services, Inc., and Elite Enterprises) that have worked with both Gilberts Development and Phoenix, including with respect to The Conservancy.

---

[1]Alternately, Storm Water Pollution Prevention *Plan*.

¶ 7　　Schroeder explained that The Conservancy, being residential construction, requires a SWPPP, which typically involves placing a silt fence to keep dirt out of the storm sewers. An SWPPP requires periodic inspections to ensure that "whatever the plan says is actually being done on the site." A properly trained inspector must be appointed to represent the builder (here, Gilberts Development). George is such an inspector. In addition to periodic inspections, an inspection must be performed and a report filed following a "harsh" weather event.

¶ 8　　George testified that Mertz approached him at a municipal meeting and subsequently retained Phoenix to do environmental and other work regarding the development of The Conservancy. Thus, George acted as the SWPPP representative for Gilberts Development with various regulatory agencies.

¶ 9　　Pursuant to a Planned Unit Development with the Village of Gilberts, Gilberts Development had certain obligations outside of the site of The Conservancy. Specifically, Gilberts Development was to build two deep wells, a water treatment plant, and make improvements to an adjoining road (Freeman Road). Mertz testified that he never asked Phoenix to perform services at the water treatment plant or Freeman Road.

¶ 10　　Phoenix produced 36 invoices in support of its claim. Some of the invoices are disputed; some are duplicative of others. We will not set forth their contents in detail; rather, we will discuss them as they are pertinent to the issues raised by the parties.

¶ 11　　A meeting occurred in either the spring or fall of 2017 at which Evon, Mertz, and Shroeder were present. Evon testified that the purpose of the meeting was to discuss unpaid invoices. Evon stated that the meeting was "very casual and friendly." Mertz "was very nice and friendly and assured" her that the invoices would be paid. Mertz encouraged her to bid on more work. Evon felt "pretty positive" that Phoenix would get paid. Schroeder also testified regarding this meeting.

He stated that he had been asked to "kind of broker a meeting between" Phoenix and Gilberts Development. Phoenix was "looking for past due invoices," and Mertz was "looking for clarity on what he was paying for." Mertz wanted "proposals before work happened so he knew what he was approving or what he was not approving." Schroeder could not recall the year this happened other than saying it was when George broke his hip, which he believed was in 2018.

¶ 12    A second meeting regarding outstanding invoices took place in approximately April 2019. George, Mertz, and Schroeder met in Schroeder's truck. Schroeder testified that George asked Mertz about outstanding invoices he said were due. Mertz questioned "some of the invoices, and it escalated." Schroeder added that "they both decided to part ways at that time and neither one of them wanted to work with each other." Mertz testified, "I made it clear to everyone in the car that I would never employ Phoenix & Associates again." He added that prior to the email, "I was telling him for months not to work on my project." Subsequent to the meeting in the truck, Phoenix provided Gilberts Development with two waivers of lien in the amounts of $25,722.50 and $21,155. The waivers state they are for work related to "snow services" and "stormwater inspection and maintenance" respectively.

¶ 13    About the time of the second meeting, Jennifer Bridgeman, who, at that time, worked for Phoenix in an administrative capacity, sent an email dated March 18, 2019, to Schroeder, Mertz, George, Evon, and Constance. The email states, "Below is the final updated summary of dollars due to Phoenix for work rendered at Conservancy including inspections and maintenance through March 15." It adds, "Phoenix has notified all parties that we will no longer be rendering SWPPP inspections or maintaining site compliance." The final balance set forth is $111,685.50.

¶ 14    George testified that in July 2019, he had a discussion with Mertz concerning SWPPP inspections. George testified, "[T]here was a discussion about me not doing them because of my

concern of the developer not meeting the required guidelines of SWPPP. Mr. Troy Mertz amplified that he didn't want me to do the inspections anymore." He added, "But I identified that if he couldn't pay and submit this that I couldn't service him anymore because I'm compromising my position with all these invoices." George added:

"I couldn't keep on advancing work and compliance activities without knowing how I was going to get paid. And in turn, I believe in July, I noted that—to the Kane-DuPage Soils Conservation District that I was withdrawing—were to withdraw, and notice was given to them. Notice from Kane-DuPage went out to [Mertz] and the other agencies, at which time he wanted to know why I was being cc'd on this e-mail. And the Kane-DuPage Soils Conservation District responded to him and said in an e-mail format he's the one on the permit, he's the responsible party."

The District added that they would continue to send notices to George until someone else was appointed. He explained that a notice was required "to change names" and that did not occur until 2022.

¶ 15    In an email authored by Mertz on July 29, 2019, and sent to George and Schroeder, Mertz stated, "Thanks again for all the great work you are doing over at the Conservancy. Please see attached grading plans for NH3 for your reference." Attached to this email are nine pages of maps and diagrams concerning neighborhood three of The Conservancy as well as links to plans for soil erosion, grading, and landscaping. While some of this concerned "activity [that] was already occurring," "the balance of it was to be done in the future." George understood this to reference work Mertz wanted him to perform. Mertz explained that this concerned work on Freeman Road, which was just south of The Conservancy and was being coordinated by Schroeder. He further stated that this was a "cordial email," as he had to work with George because the Village of Gilberts

"wants him in or around their project." During a meeting concerning the Freeman Road work, George expressed to Mertz that the work they were doing would ameliorate drainage issues at The Conservancy. The email was not a request for George to perform work at The Conservancy. The documents attached to this email concerning soil erosion, grading, and landscaping had been requested by George in connection with this work. Mertz did not employ Phoenix regarding this work.

¶ 16    Further, George identified a series of emails between Mertz and Patrick McPartian, which was copied to George and the Army Corps of Engineers. McPartian is a representative of the Kane/DuPage Soil and Water Conservation District. The first email (dated July 2, 2020), from McPartian, asks Mertz to take into account certain information regarding The Conservancy going forward. The second email (dated July 6, 2020), authored by Mertz, asks, *inter alia*, why George was being copied on the first email. Mertz states the Rob Vanni is his SWPPP representative. Mertz adds, "To be clear, [George] does not work for me." McPartian, in the third email (dated July 6, 2020), states that George "is listed as the job site contact person." It continues, "I look forward to hearing from Mr. Vanni once again. From our last conversation on the phone, 2 weeks ago, he made it clear that he wasn't involved in the project."

¶ 17    Mertz testified that in 2019, the mayor of the Village of Gilberts, in an email, stated that George did not work for Gilberts Development. Further, George, "made the announcement and broadcast to the Village of Gilberts in 2019 he was no longer providing SWPPP service for my project."

¶ 18    Finally, George testified that if he had wished to terminate his relationship with Gilberts Development, he would have had to give notice to the relevant regulatory agencies and allowed "a certain time to cure." He explained why he never gave notice:

"I had an obligation to maintain compliance in the waterways. I have my name, and if I give my word that I'm going to continue doing this until someone steps in, even at my cost, I'm not going to compromise my obligation or the pollutants going into these creeks. I'm not going to walk away from it."

¶ 19    George agreed, however, that he could have taken steps that would have terminated his relationship with Gilberts Development.

¶ 20    In its ruling, the trial court first observed that Phoenix had alleged four counts: count 1 sought to foreclose a mechanic's lien; count 2 alleged a breach of contract; count 3 alleged unjust enrichment; and count 4 sought recovery on a *quantum meruit* theory. The trial court first found that Phoenix did perform work for Gilberts Development beginning in 2014 and continuing for "several years." It added that the work "was in several fields, which included paving; environmental consulting; SWPP [*sic*] services ***; grading and stabilization, [and] snow removal." The trial court further noted that the complaint alleged the existence of a written contract. It further observed that reference to the contract

"is included in the Defendant's Mechanic's Lien that he filed on or about October 24[,] there was a written subcontract between Phoenix and Gilberts [Development] to furnish all necessary labor, material, tools, equipment, taxes, insurance, and supervision to furnish environmental consulting SWPP [*sic*] services, site work, grading and stabilization, paving, snow removal and salting, both plans and specifications for and in said improvement, and that on November 20th the claimant Phoenix completed thereunder all the required by said written subcontract to be done to the value of $1,485,892.00."

The complaint alleged that $225,000 remained due.

¶ 21    The trial court then found that "during the trial no written contract was produced, talked

about, or proven." It then noted that "in a Mechanic's Lien case, a lien is only valid if each of the statutory requirements is scrupulously observed." The burden is on the party seeking to enforce the lien. Relying on *Ronning Engineering Co., Inc. v. Adams Pride Alfalfa Corp.*, 181 Ill. App. 3d 753 (1989), the trial court held that where a written contract is alleged, it must be proven, and the failure to do so means that Phoenix failed to satisfy section 7 of the Mechanics Lien Act (770 ILCS 60/7 (West 2022)). Accordingly, the trial court denied Phoenix's claim under its first count.

¶ 22    Turning to the second count, breach of contract, the trial court found that Phoenix failed to prove the essential terms of a contract. It therefore found against Phoenix on the second count.

¶ 23    It then considered the remaining two counts: unjust enrichment (count 3) and *quantum meruit* (count 4). It awarded damages on the latter claim. It noted that *quantum meruit* requires that a party performed services "at the instance and request of another, and there is no exact conversation about the compensation of such services." In such circumstances, "[t]he law implies a contract and the party who performs a service shall be paid a reasonable compensation therefore [*sic*]." The trial court then addressed damages. It noted that Phoenix had produced 36 invoices it alleged were unpaid. George could not specify the exact work on all of these invoices, as some were a decade old. The evidence indicated that a number of the invoices were duplicative. Moreover, "some of them were paid" and three were covered by "lien waivers that the Defendant produced." Further, there "was negotiation about some of those as to what was to be paid." The trial court then entered judgment in favor of Phoenix in the amount of $113,092. This appeal and cross appeal followed.

¶ 24                              III. ANALYSIS

¶ 25    In its appeal, Gilberts Development, raises five primary issues, all directed at the trial court's *quantum meruit* award. First, Gilberts Development contends that Phoenix failed to prove

the value of the services it performed. Second, Gilberts Development asserts that the services provided by Phoenix did not confer a benefit upon it. Third, Gilberts Development argues that Phoenix acted gratuitously after March 18, 2019. Fourth, Gilberts Development contends that Phoenix was not entitled to an award for services performed outside of The Conservancy. Fifth, Gilberts Development seeks to invoke the statute of limitations. As we find Gilberts Development's first argument well founded, its remaining arguments, which are also attacks on the *quantum meruit* award, are moot. See *People v. Moreno*, 2015 IL App (3d) 130119, ¶ 49 ("Defendant's alternative argument that the trial court considered facts outside of the evidence is rendered moot as a result of our reversal on defendant's sufficiency of the evidence claim."). Phoenix also cross-appeals, arguing that the trial court erred in denying its claim to foreclose a mechanic's lien.

¶ 26          A. Gilberts Development's Appeal—Proof of Value of Services

¶ 27      Gilberts Development first contends that Phoenix set forth no evidence that the value of services contained in the invoices it submitted were reasonable. *Quantum meruit* is an equitable remedy designed "to provide restitution for unjust enrichment and is often pleaded as an alternative claim in a breach-of-contract case so that the plaintiff may recover even if the contract is unenforceable." *Weydert Homes, Inc. v. Kammes*, 395 Ill. App. 3d 512, 522 (2009). It is "a cause of action seeking recovery for the reasonable value of services nongratuitously rendered, but where no contract exists to dictate payment." *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979 (2010).

¶ 28      To recover under a *quantum meruit* theory, a plaintiff must establish that: (1) it performed a service that benefited the defendant, (2) it did not perform this service gratuitously, (3) the defendant accepted the service, and (4) no contract existed regarding payment for the service.

*Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 781 (2002). The measure of damages in a *quantum meruit* claim is "the reasonable value of [the] work and material provided" by the plaintiff. *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 9 (2004). This differs from unjust enrichment, where an award is determined by the benefit retained by the defendant. *Id.*

¶ 29    In a *quantum meruit* claim, "liability is predicated on the reasonable value of services performed." *Nardi & Co. v. Allabastro*, 20 Ill. App. 3d 323, 327 (1974). Hence, "recovery is limited to the reasonable amount by which the trial court finds defendant was unjustly enriched at the expense of the plaintiff." *Id.* at 328. A "plaintiff must provide a basis for assessing damages with a 'fair degree of probability,' but need not prove the exact amount of its loss." *Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶ 64 (quoting *Benford v. Everett Commons, LLC*, 2014 IL App (1st) 130314, ¶ 30). That is, a plaintiff must "introduce some evidence specific enough to prove the reasonable value of the benefit [the defendant] allegedly received." *Bernstein & Grazian, P.C.*, 402 Ill. App. 3d at 979. The amount of damages is a factual matter. *Anderson v. Gewecke*, 36 Ill. App. 3d 170, 176 (1976). As such, the manifest-weight standard applies to this issue (*Bernstein & Grazian, P.C.*, 402 Ill. App. 3d at 978-79), and we will reverse only if an opposite conclusion to the trial court's is clearly apparent (*Gerber v. Hamilton*, 276 Ill. App. 3d 1091, 1093 (1995)).

¶ 30    Gilberts Development argues that "Phoenix failed to introduce the reasonable value of the labor and materials provided. Phoenix simply introduced invoices that were generated by an office administrative assistant and approved by [George] without any evidence as to reasonableness."

¶ 31    Gilberts Development calls our attention to *Big Farmer, Inc. v. Agridata Resources, Inc.*, 221 Ill. App. 3d 244, 248 (1991), where a trial court denied the plaintiff leave to add a *quantum meruit* count to its complaint because it offered no evidence regarding the reasonable value of the

services it allegedly rendered:

> "In the alternative, the plaintiff argues that his own testimony and that of *** the defendant's expert, should form the basis of a *quantum meruit* claim. An examination of their testimony, however, reveals that both men testified how they normally charged customers. Neither testified as to industry wide standards or formulated an opinion as to the reasonable value of the services [the plaintiff] provided [the defendant].
>
> A review of the record shows that the court afforded the plaintiff every opportunity to present evidence as to the reasonable value of the services [the plaintiff] provided [the defendant]. For strategic reasons, the plaintiff declined to present such evidence. Lacking proof upon which a *quantum meruit* claim could be granted, the trial court correctly refused to allow the plaintiff to amend his complaint. Nor did the court choose to speculate as to what the reasonable value of the plaintiff's services might be. In our estimation, the trial court's actions were entirely proper." (Emphasis omitted.)

Gilberts Development asserts that in this case, while Phoenix offered evidence of how the invoices upon which it based its claim were generated, it introduced no evidence that the charges contained in the invoices were reasonable. Phoenix seeks to distinguish *Big Farmer* on the ground that it involved the Uniform Commercial Code; however, it is not apparent to us why this would matter and Phoenix does not elaborate.

¶ 32 Gilberts Development also points to *Rohter v. Passarella*, 246 Ill. App. 3d 860 (1993), which provides an example of the sort of proof that would satisfy a plaintiff's burden on this issue. In that case, the plaintiff sought to recover the value of accounting services rendered to the defendant. The reviewing court reversed the trial court's grant of a directed finding based on the plaintiff's purported failure to prove the value of the services it had rendered. The reviewing court

found that the plaintiff had set forth ample evidence of value, within the context of a *quantum meruit* claim:

"For instance, [the] plaintiff entered into evidence a publication of the IRS which instructs those who are engaged in the practice of preparing tax returns how to complete various IRS forms and schedules properly. Pursuant to the Paper Work Reduction Act of 1980 (5 U.S.C. § 5315 (1988)), each instruction also includes an estimated average time required to complete the particular form or schedule. [The p]laintiff also offered the testimony of Joseph Dubow, who, upon being found by the court to be an expert after testifying in almost excruciating detail about the practice of tax accounting, informed the court how long it takes the average accountant to complete various forms and schedules, *and what would constitute a fair price for that service. He also affirmed that each of the charges for which plaintiff billed defendants represented a reasonable reflection of the value they received when the services were rendered.*" (Emphasis added.) *Id.* at 866-67.

Thus, in addition to evidence regarding how work was performed, the plaintiff also offered evidence that the amounts charged for those services were reasonable.

¶ 33    In the present case, Phoenix has offered no evidence that the charges set forth in its invoices were reasonable. The mere fact that these amounts were billed to Gilberts Development is insufficient proof of value. *Keno & Sons Construction Co. v. La Salle National Bank*, 214 Ill. App. 3d 310, 312 (1991) ("The burden lay with [the plaintiff] to prove the existence and extent of its alleged damages; all it proved was the amount of the bills it sent to [the defendant]. Proof of a bill for a particular amount, without more, is not evidence of the value of services rendered or materials furnished."); *Wing v. Lederer*, 77 Ill. App. 2d 413, 420 (1966) ("Proof of delivery of a bill in a given amount, standing alone, is not evidence of the reasonable value of services rendered or of

-12-

materials furnished."). Accordingly, Phoenix failed to establish its damages in this case.

¶ 34    In an attempt to refute this proposition, Phoenix claims that it set forth adequate evidence of the value of the services it rendered. It first sets forth George's qualifications, which, we agree, would be sufficient to allow him to be qualified as an expert on SWPPP issues and related environmental matters, including the costs of such services. See *Ayala v. Murad*, 367 Ill. App. 3d 591, 597 (2006) ("An expert witness is a person who, because of education, training, or experience, possesses specialized knowledge beyond the ordinary understanding of the jury."). Phoenix then goes on to discuss his testimony as it pertained to various invoices.

¶ 35    For example, Phoenix points to George's testimony regarding the first invoice dated December 31, 2014, which we will set forth here:

> "Q All right. Let me ask you another question. After some work is done for a customer such as Gilberts Development, LLC, are you the one who reports to the bookkeepers at Phoenix & Associates the value of that work?
>
> A Yes, I do, sir.
>
> Q And how do you figure out the value of that work?
>
> A I review the daily logs of activities of its—of the employees of Phoenix, machinery, any other material that's ordered reflective of the activity that we keep notes on the job site, and in this case we would keep notes on the Conservancy job site and identify manual labor, machinery, equipment, materials.
>
> Q And who prepares the invoices that go from Phoenix to the customer?
>
> A The administrative assistant, various people, Jen Bridgeman, Yvonne [*sic*] Kanagin, Constance Kanagin.
>
> Q And do you review those invoices before they go out to the customer?

A Yes, I do, sir.

Q So do you check them for accuracy?

A To the best—yes, I do, sir.

Q Okay. Let me show you what's been marked as Phoenix Exhibit 1 for identification, and I'll ask you if you recognize that document.

A Yes, I do, sir.

Q Is that a record that's kept in the ordinary course of business by Phoenix & Associates?

A Yes, it is, sir.

Q Is it a record that—is it in the ordinary course of business of Phoenix & Associates to keep records of that nature?

A Yes, it is, sir.

Q Okay. And specifically we're talking about copies of invoices that Phoenix sends to its customers, correct?

A Yes, sir."

While George's testimony describes the process by which this invoice was generated, we see nothing here that concerns the reasonableness of the charges contained in it. Phoenix asserts that the parties "discussed and adjusted the amount" of this invoice. However, the passage of the record cited merely reflect that a credit was applied for a partial payment Gilberts Development made. Phoenix does not explain how an inference can be drawn regarding the reasonableness of the entire charge based on Gilberts Development's partial payment.

¶ 36    Phoenix asserts that the charges contained in the second invoice, dated May 16, 2016, are "detailed" in George's testimony, which is true. Specifically, Phoenix cites the following passage, where, after stating the invoice remained unpaid, George described the work it covered:

"Q And what's the nature of the work that is being billed for?

A This is a creek area that was nicknamed River George that needed the removal of debris, sediment, and fallen trees that were in the waterway.

Q And was that work necessary to comply with the SWPPP that was on file at the time with respect to Gilberts Development and the Conservancy?

A Absolutely.

Q Please explain why clearing that creek was required to comply with the SWPPP.

A Any activity or damages or conditions on the site have to be maintained and kept in good standing. The SWPPP that you reference involves anywhere from 8 to 15 different agencies that have a right to review if the site is in compliance and is being maintained. In this particular case, because of the fallen trees and conditions, it was required to clear that as required by the agency."

Again, nothing in the material Phoenix points to addresses the reasonableness of the charges in the invoice. George went on to describe various regulatory requirements and then testified as follows:

"Q Okay. What did you bill for on Phoenix 21 Exhibit No. 2?

A Well, the items that you just conveyed to me, we billed on those items identifying what those—policing the best management practices, and there were many more additional items that were required.

Q Okay. Just direct your attention to the exhibit that's in front of you, Phoenix No. 2.

A Yes, sir.

Q I think you told me that was for clearing a stream?

A Yes.

Q Is that part of what was required of Gilberts Development, LLC, under its SWPPP plan?

A Yes, sir.

Q And that's why you did that work?

A Yes, sir.

Q Was that invoice ever paid?

A No, sir."

Nothing in this testimony concerns the reasonableness of the charges in the second invoice.

¶ 37 Phoenix addresses additional invoices in this manner. We have reviewed the testimony of George that Phoenix cites in support of its claim that it provide evidence of the reasonableness of the charges contained in the various invoices and have determined, like the two invoices discussed above, none contain evidence of the reasonableness of the charges at issue, save for an isolated reference to one charge being based on "market value."

¶ 38 Accordingly, Phoenix has failed to prove its entitlement to damages. A judgment that is unsupported by evidence of record is contrary to the manifest weight of the evidence. *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001). We therefore reverse the trial court's award of damages on count 4 in this case.

¶ 39                    B. Phoenix's Cross Appeal—Mechanic's Lien

¶ 40 In its cross appeal, Phoenix argues that the trial court erred in rejecting the first count of its complaint seeking to foreclose a counterclaim. The trial court rejected Phoenix's request, citing the fact that Phoenix failed to prove the existence of a contract. In support, the trial court cited section 7 of the Mechanics Lien Act (770 ILCS 60/7 (West 2022)) and *Ronning Engineering Co., Inc.*, 181 Ill. App. 3d 753. Where the facts are undisputed, the existence of a contract presents a question of law subject to *de novo* review. *BMO Harris Bank, N.A. v. Porter*, 2018 IL App (1st) 171308, ¶ 51. Similarly, to the extent that we must interpret section 7, *de novo* review is also

appropriate. *In re County Collector*, 2022 IL 126929, ¶ 19.

¶ 41    Phoenix contends that section 7 is inapplicable to this case, as it only applies to attempts to enforce a lien against a third party, specifically, "any other creditor or incumbrancer or purchaser." 770 ILCS 60/7 (West 2022). Phoenix points out that all subordinate interests initially named in the complaint were dismissed after Gilberts Development posted a bond substituted for their interests. We note that section 7 includes purchasers within its scope. Phoenix does not address the sale of at least portions of The Conservancy to Ryan Homes. Mertz testified that by the spring of 2017, all lots in Neighborhood 1 of The Conservancy had been sold to Ryan Homes. Nevertheless, Phoenix is correct to the extent that it asserts that, section 7 notwithstanding, it would be able to assert a mechanic's lien against Gilberts Development as the original owner. See *Appollo Heating & Air Conditioning Corp. v. American National Bank & Trust Co.*, 135 Ill. App. 3d 976, 980 (1985) ("In the event the contractor fails to comply with section 7 of the Act, the lien may not be enforceable against such third parties, but may nonetheless be enforced against the original owner.").

¶ 42    However, it is well-established that we review the result at which the trial court arrived rather than its reasoning (*In re Marriage of Ackerley*, 333 Ill. App. 3d 382, 392 (2002)) and may affirm on any basis appearing in the record (*Zerjal v. Daech & Bauer Construction, Inc.*, 405 Ill. App. 3d 907, 911 (2010)). To this end, Gilberts Development points to Phoenix's failure to prove the terms of a contract between the parties.

¶ 43    Gilberts Development cites *Power Dry of Chicago, Inc. v. Bean*, 2022 IL App (2d) 210043, ¶ 44, where this court held:

> "The Mechanics Lien Act assumes a valid contract exists between the parties. See 770 ILCS 60/11(a) (West 2018). Therefore, the legal capacity to foreclose a mechanic's lien

depends upon the validity of the lien. *G.M. Fedorchak & Associates, Inc. v. Chicago Title Land Trust Co.*, 355 Ill. App. 3d 428, 433 (2005) (citing *Pascal P. Paddock, Inc. v. Glennon*, 32 Ill. 2d 51 (1964)). The lien, in turn, ' "must be based upon a valid contract, and in its absence the lien is unenforceable." ' *Id.* (quoting *Paddock*, 32 Ill. 2d at 53, 203 N.E.2d 421)."

As noted, the trial court found that Phoenix failed to prove the essential terms of a contract and found against Phoenix on its breach-of-contract claim. Indeed, the trial court could not have awarded damages on Phoenix's *quantum meruit* theory had it found a contract existed. See *Installco, Inc.*, 336 Ill. App. 3d at 781 ("To recover under a *quantum meruit* theory, the plaintiff must prove that: (1) he performed a service to benefit the defendant, (2) he did not perform this service gratuitously, (3) defendant accepted this service, and (4) *no contract existed to prescribe payment for this service*." (Emphasis added.)). Given the trial court's determination that no contract existed is not against the manifest weight of the evidence, Phoenix cannot prevail on this claim.

¶ 44    In its reply, Phoenix argues that a construction contract may be written or oral, citing *Midwest Environmental Consulting & Remediation Services, Inc. v. Peoples Bank of Bloomington*, 251 Ill. App. 3d 256, 267 (1993), *Edward M. Cohon & Associates, Ltd. v. First National Bank of Highland Park*, 249 Ill. App. 3d 929, 942 (1993), and *First Federal Savings of Chicago v. Connelly*, 97 Ill. 2d 242, 244 (1983). While this is true, Phoenix does not explain, in light of the trial court's finding on the breach-of-contract count and its *quantum meruit* award, how it proved the existence of an oral contract. Phoenix points to the course of performance whereby it rendered services to Gilberts Development; however, if this were sufficient proof of a contract, *quantum meruit* would not exist as a theory since the rendering of services would necessarily prove a

contract. Moreover, Phoenix does not attempt to establish what the terms of such a contract would be. As such, we find Phoenix's argument on this point unpersuasive.

¶ 45    Accordingly, we affirm the trial court's denial of Phoenix's attempt to foreclose a mechanic's lien.

¶ 46                                  IV. CONCLUSION

¶ 47    In light of the foregoing, the judgment of the circuit court of Kane County awarding Phoenix damages in *quantum meruit* is reversed, and its judgment is otherwise affirmed.

¶ 48    Affirmed in part and reversed in part.